# EXHIBIT 11

OPTN/UNOS
BOARD OF DIRECTORS MEETING

OPEN SESSION

EXCERPT:
ELIMINATE THE USE OF DSAs AND REGIONS
IN LIVER DISTRIBUTION

Four Seasons Resort and Club
Dallas at Las Colinas
4150 North MacArthur Boulevard
Irving, Texas  75038

Monday, December 3, 2018

3:48 p.m.

1  of Organ Transplantation.

2          And so I just really want to thank you for

3  this opportunity today.  And we at HRSA want to be

4  clear that we believe that organ allocation policies

5  are best developed by the experts within the transplant

6  community, which is each and every one of you around

7  the table.

8          As members of the OPTN Board of Directors, you

9  have a responsibility for determining how the national

10 resource of donated organs will be distributed,

11 consistent with the requirements of the OPTN final

12 rule.  We wish to express our deepest appreciation for

13 the substantial time that the OPTN board, the Liver

14 Committee and others have expended studying and

15 discussing the liver allocation policy.

16          MR. HOLLOMAN:  As most of you probably already

17 know by now, in a July 31, 2018, letter to the OPTN,

18 HRSA informed the OPTN of its determination that the

19 OPTN had not justified and could not justify the use of

20 donation service areas, DSAs, nor OPTN regions as

21 currently constituted in the current liver allocation

22 policy and in the revised liver allocation policy that

1  was approved by the OPTN Board of Directors in December

2  2017 under the requirements of the final rule.  HRSA

3  explained that neither the DSAs nor the OPTN regions

4  were created to allocate organs equitably or to

5  optimally distribute donated organs.

6          HRSA further explained that the 58 DSAs and

7  the 11 OPTN regions in the U.S. vary widely in

8  geographic size and population.  HRSA's letter and

9  guidance resulted in from the agency's consideration of

10  critical comments that were received by the HHS

11  Secretary in May of 2018.

12          The letter also provided direction to the OPTN

13  board to approve a liver allocation policy consistent

14  with the terms described in the letter and the OPTN

15  final rule by December 2018, so by this meeting.

16          HRSA did not and is not directing any

17  particular policy outcome nor allocation scheme.

18  However, HRSA has made it clear that the OPTN board

19  must consider and explain how any liver allocation

20  policy approved by the board satisfies the requirements

21  of the OPTN final rule.

22          In addition to the eliminating the use of DSAs

1   and regions, the OPTN board was directed to provide its

2   written rationale together with supporting evidence

3   explaining how any geographic limitation is justified

4   and required by 42 CFR 121-8.

5           (Slide.)

6           MR. HOLLOMAN:  As you see up there behind you,

7   we thought it was important to pop that up on the

8   screen, as well, the allocation of organs.  Such

9   allocation policies shall be based on sound medical

10  judgment, shall seek to achieve the best use of donated

11  organs, shall be designed to avoid wasting organs, to

12  avoid futile transplants, to promote patient access to

13  transplantation and to promote the efficient management

14  of organ placement.  And under 8, shall not be based on

15  the candidate's place of residence or place of listing,

16  except to the extent required by paragraphs A1 through

17  5 of this section.

18          And the board was instructed to provide its

19  rationale as to how any specific geographic units of

20  distribution is justified by one of those regulatory

21  factors.

22          It is imperative for the operation of the

1  between the median MELD at transplant in the NLRB but

2  also just because of the fact that these are both major

3  changes and there's a lot of programming and other

4  things that need to be carefully analyzed to make sure

5  there's no bugs or problems.  And to put these two too

6  close together, we felt, would be asking for

7  significant trouble.

8          So we -- I did want to take a moment to

9  reflect on the proposed amendments because, actually, I

10  think it's important for you to hear from the

11  committee, specifically when we had already talked

12  about some of these amendments, what the feedback was.

13  So in a structured way, I am just going to walk through

14  these.  I am, of course, going to be sitting here if

15  you have questions.  I can still provide additional

16  feedback.  But I just want to preemptively provide to

17  you feedback from the committee about the amendments.

18          So first of all, B2C versus AC model.  We will

19  hear an amendment today that the board instead consider

20  the Acuity Circle model instead of B2C.  I tried to

21  highlight for you already why the Liver Committee would

22  be in more support of the B2C.  And that's primarily

1  around the recipient hospital.

2          It's a little confusing because this is the

3  recipient hospital, whereas all of the other circles

4  are around the donor hospital.  But it's not that

5  confusing.  It's just important to recognize that

6  slight difference.

7          For the purposes of the change in that policy

8  for distribution and allocation, that both the

9  transplant hospitals and the OPOs would need to change,

10  prepare for this change.  There's going to be a

11  difference in offer patterns.  Depending on which model

12  we choose it may or may not be slightly larger.  We

13  would have to build relationships with programs and

14  OPOs that we previously hadn't been working with a lot.

15  We would have to prepare for expected changes in the

16  frequency, the mode of travel for organ recovery,

17  potential staffing changes, modify organ recovery

18  arrangements, meaning that we would consider recovering

19  more for each other than we have in the past.

20          And then in terms of the time line, we're

21  still thinking for the NLRB the first quarter of '19

22  and the other policy to follow that, which at least

1 three months and maybe more months, it's hard to say.

2 But we're ready to roll with the education, already

3 we've got the modules good to go.

4        Where in the strategic plan does this fit?

5 Already Sue told us that it was improving equity and

6 access to transplant.  We're hoping that this proposal

7 will improve geographic disparity and access to

8 transplant.  And also it touches the goal of efficient

9 management of the OPTN in that we would hopefully

10 alleviate the legal risk to the OPTN regarding the use

11 of DSA and regions in the policy, which is very

12 important.  This is a time-sensitive issue.  This has

13 come to us specifically on a time line and we were

14 asked to deliver by December of -- of now.  So that is

15 the situation that we are in.

16        (Slide.)

17        DR. HEIMBACH:  And there's the fiscal impact

18 slide that I think is always a part of everything.  We

19 made it really small so you couldn't see.

20        (Laughter.)

21        DR. HEIMBACH:  But it's really the big one

22 here, whatever that's called, the enterprise situation.

1  is, "Organs shall be distributed as broadly as

2  possible."

3      And then the burden is really upon the board

4  and the OPTN to defend any choice that is not

5  distributing organs as broadly as possible.  Now, the

6  writers of the final rule, you know, and everybody else

7  in the transplant community recognizes that it does not

8  necessarily make sense to have every organ offer be

9  distributed nationally.  And so that's what Sections 1

10  through 5 of this are talking about.

11      So the first section that you look at under

12  here says they shall be based on sound medical

13  judgment.  The way that I've described this to many

14  folks says that this is not a popularity contest.  This

15  has to be based on evidence.  And the OPTN has long

16  worked over many decades to make sure that our policies

17  are based in evidence.

18      The second one being they shall seek to

19  achieve the best use of donated organs.  And so as it

20  relates to this allocation policy, as yourself are

21  these frameworks going to be increasing or decreasing

22  the amount of transplants?  And roughly, the answer is,

1  no, as Julie mentioned, that wasn't the goal of this

2  specific allocation policy.  And so there isn't -- you

3  won't see a large impact there.

4           Same thing on number 5, they shall be designed

5  to avoid organ wastage.  So maybe you want to, you

6  know, decrease the geographic distribution of organs in

7  order to, you know, not have organ wastage.  You also

8  have another way to look at that.  But you can look at

9  the number of organs that are being transplanted but

10  again you don't see much of a change there.

11          Also in number 5 you see avoiding futile

12  transplants.  You can look at post-transplant outcomes

13  and again you don't see any negative impact there from

14  any of these models.

15          And then we really come down to the two parts

16  of number 5 that are really in conflict as it relates

17  to this particular proposal, promoting patient access

18  to transplantation.  As Julie has said, you know, the

19  committee has looked at many metrics but primarily the

20  variance in median MELD at transplant to measure the

21  access to transplantation.  And then, two, promoting

22  the efficient management of organ placement.  Not

1  race.  And there was no specific -- and also several

2  other newer things, like the measurements of increased,

3  you know, community risk score, so the less healthy

4  communities, we looked at that as well.

5           The only area that was different was age, and

6  there was actually an improvement for the pediatric

7  candidates, so they did a little bit better than any of

8  the other groups.  But, for looking specifically at

9  Asian and other specific race and then also looking at

10  women versus men, there was no difference in those

11  different analyses.

12           DR. McCAULEY:  I'm reassured by that.

13           MS. DUNN:  Todd Pesavento.

14           DR. PESAVENTO:  Thank you.  I really

15  appreciate how much work you've put into it, and I'm

16  sure the Kidney Committee will have as much work in the

17  future, which I think is even a much more greater

18  problem, just because of the magnitude of patients that

19  are affected.

20           I guess one comment is I'm concerned about 40

21  percent of the people that didn't like any of these

22  policies.  So no matter what decision we reach today, I

1  Dr. Ken Brayman, who has proposed tabling the proposal,

2  which would have the effect of reverting back to the

3  December 2017 policy -- policy that was voted on by

4  this body last December.

5           Dr. Brayman.

6           DR. BRAYMAN:  Thank you very much.  And I

7  appreciate the opportunity to share my thoughts.

8           I am very concerned at this point.  And I

9  certainly admire the work of the Liver and Intestinal

10  Committee, and I appreciate the perspective that HRSA

11  has as to the need to move things forward.

12           But I am very concerned that using distance

13  from donor hospital fails to fully comply with NOTA in

14  the final rule.  And I will outline my thoughts on this

15  shortly.

16           I'm very concerned that significant areas of

17  disagreement remain within the liver transplant

18  community and, in particular, members of the Liver

19  Transplant Committee concerning the proposals being put

20  forward today.  I am very concerned we are being

21  pressured, unfairly in my view, by HRSA's insistence on

22  a short time line.  And this has resulted in a

1 breakdown of our normal policy-making process; i.e.,

2 where is all the modeling?

3          I am also concerned that we continue to debate

4 differences in regional OPO performance versus broader

5 sharing of organs.  And clearly, organ donation is

6 highly influenced by our local communities.  The impact

7 of the current proposals on local organ donation is a

8 major concern.

9          In the interests of our patients, UNOS, the

10 OPTN and the integrity of our independence and policy-

11 making processes, I urge you to join me in supporting a

12 tabling of the consideration of the committee proposals

13 and allow us to return to the most recently approved

14 liver proposal, while we continue to work diligently

15 and transparently with HRSA and the transplant

16 community to address equitable liver allocation.

17          In December 2017, after years, literally years

18 of protracted deliberation, the OPTN board of directors

19 approved a policy which was generally agreed upon and

20 was a reasonable compromise.  Less than one year later,

21 before the approved policy had even taken effect, there

22 was now a rush to change the allocation model that was

1  the result of many years of hard work and modeling.

2  HRSA directed the OPTN to adopt a liver allocation

3  policy that eliminates DSAs in OPO regions and that is,

4  quote, compliant with the OPTN final rule, end quote.

5          The proposals under discussion today are not

6  compliant with the final rule.  Criticisms against DSA

7  are acknowledged.  But the solution is not to rush yet

8  another allocation policy through that clearly does not

9  comply with the final rule.  The proposals being put

10  forward focus disproportionately on reducing median

11  MELD at transplant, a flawed metric that does not

12  equate with whether candidates have equal access to

13  transplantation.

14          The final rule requires that an allocation

15  policy be designed to avoid wasting organs, to promote

16  the efficient management of organ placement, and to

17  promote patient access to transplantation.  The current

18  proposals lay the groundwork for continued litigation

19  from both the current plaintiffs and others who will

20  argue that both B2C 29 and Acuity Circles are arbitrary

21  and capricious.

22          Each scenario modeled for the proposal reduces

1  the number of transplants, increases organ wastage and

2  delays donor surgeries.  The broader two-circle model

3  with sharing threshold at 35, scenario five in the SRTR

4  modeling for those that remember it, was the last

5  harmful and least disruptive to allocation that was

6  proposed and approved by the board in December 2017.

7        The current proposal's failure to properly

8  consider socioeconomic inequities in the OPTN's narrow

9  interpretation of patient access is inconsistent with

10  legislative and regulatory intent.  The proposals fail

11  to consider both socioeconomic inequity and fail to

12  promote access to transplantation.

13        Under the final rule, the OPTN board of

14  directors is responsible to develop policies that

15  further the OPTN's mission.  The proposed policy has

16  not been designed to promote patient access to

17  transplantation but only considers access to

18  transplantation for those already on the wait list.

19        Congress has had and continues to have

20  significant, ongoing concerns about the ability of low-

21  income populations and ethnic minority groups to have

22  access to transplantation sources, including access to

1  the wait list.  As such, both proposals are legally

2  untenable and should not be supported.

3         The cumulative effect of allocation policies

4  on socioeconomic inequity and promotion of patient

5  access to all stages of transplantation services can

6  consider a patient's -- a candidate's place of

7  residence to achieve the optimal use of donated organs

8  and promote patient access to transplantation.  A

9  lawful and equitable liver allocation policy should

10  result in a greater number of organs being made

11  available in states with higher wait list mortality

12  rates and lower access to quality health care.

13         The median MELD at transplant is a flawed

14  metric to assess severity of a patient's illness in the

15  geographic equity of liver allocation policy.

16  Ironically, the OPTN relies on median MELD at

17  transplant across DSAs to conclude that livers are

18  unfairly allocated.  The OPTN states that DSA's may not

19  be considered when forming allocation policies, yet the

20  OPTN relies on those geographic boundaries to measure

21  median MELD at transplant disparity.

22         I summary, significant concerns are raised

1 about the specific proposals and the policy development

2 process.  Acuity Circles will be particularly

3 devastating to rural communities.  I urge the OPTN and

4 the board to defer further discussion on the hastily

5 derived proposals -- I appreciate the work of the Liver

6 and Intestinal Committee.  But under the current

7 consideration, we need new models that take an

8 incremental approach to simultaneously address organ

9 procurement flaws, to improve access and

10 transplantation overall.

11         As a field and a board, we are obliged to take

12 care of the most vulnerable populations.  When NOTA was

13 drafted and when the final rule was implemented and

14 subsequently amended there was no intention to

15 prejudice allocation or access to transplantation.  We

16 need to do the right thing.

17         We need to table the discussion on the current

18 proposals.  We need to implement the December 2017 plan

19 and we need to get moving on a legally tenable plan to

20 fix both liver allocation and organ donation.

21         And I appreciate the perspectives of the other

22 members of the board and I recognize that perhaps I'm a

1  salmon fishing upstream and there are many grizzly

2  bears that are about to take a chunk out of my side.

3  But when you think about the current situation and the

4  inequities that are likely to follow and the

5  litigation, it makes no sense to move forward with the

6  B2C or the Acuity Circles at this point.

7          What we need to do is double down on our

8  effort to work with HRSA to figure out what's

9  compatible and what's likely to move forward.  And to

10 put forth these proposals right now, just to eliminate

11 the language of DSA and OPO is ludicrous.  And,

12 furthermore, we're doing it based on geography but

13 related to the donor hospital.  So it's really no

14 different.

15         Thank you very much.

16         MS. DUNN:  Since we have a letter directed

17 from HRSA to move away from the December policy, I am

18 going to turn this over to HRSA to respond, please.

19         MR. McLAUGHLIN:  Right.  I just want to

20 reiterate that, you know, we had a July -- also in a

21 July 31 letter to the OPTN, HRSA informed the OPTN of

22 its determination that the OPTN had not justified or

1  that something that went from December until now -- or,

2  I'm sorry, June until now is not a short time frame, I

3  don't think that's being -- I don't think that's being

4  accurate, despite all the effort that's been put in,

5  which I think I greatly acknowledge.

6          And then I just -- I wonder about arbitrary.

7  So when we talk about circles and you look at

8  population densities, is it not just as arbitrary that

9  a circle that encompasses 50 million people would be

10  different than a population density that includes like

11  50,000 people?

12          DR. HEIMBACH:  You know, so I don't know if

13  arbitrary is the right word because it's still --

14          DR. PESAVENTO: Or disparity.

15          DR. HEIMBACH:  -- the same size.  But does it

16  do the same thing?  Obviously, it does not.

17          And so that's why it's really important to

18  look at the proposal.  It's why we initially were

19  excited about a population-based model.  And if this

20  model performs the way we want, that's great.  If it

21  doesn't, how can we change it and what would we change?

22  And that's, I think, the path forward.  And I think

1  that's really critical.

2       Because obviously the impact of a circle of a

3  certain size in an area which is densely populated is

4  different than a circle of a certain size in an area

5  that is more sparsely populated.  I would agree with

6  that assessment.

7       But on the other hand, you know, the two

8  models are substantially -- are different enough to say

9  that if you are favoring one versus the other, then

10 that would guide you to select one or the other.

11      MS. DUNN:  Brian, if you could speak to kind

12 of the organizational risk related to the letter that

13 we received from HRSA back in June, please?

14

15      MR. SHEPARD:  Sure.  I mean, I think we've --

16 we all know how we got here.  We have some risk of

17 judicial intervention.  But even if you hold a

18 differing opinion of what the risk of that particular

19 intervention is, we have a very clear letter from the

20 Secretary that insists that the OPTN adopt a new policy

21 that does not include DSA by this meeting.

22      The Secretary, in the regulation, has the

1  power to -- to tell us what a policy is.  That's never

2  happened before.  And I think that the Secretary and

3  the HRSA representatives have been careful not to tell

4  us what the solution is.  But I think a decision not to

5  move forward on one of the -- at least one of the liver

6  options today would carry tremendous organizational

7  risk and potentially harm our ability to make these

8  decisions in the future.

9          MS. DUNN:  Thank you.  Chris.

10          DR. ANDERSON:  Just a quick comment.  So being

11  from the region that proposed a state-based system, or

12  at least to the Geography Committee proposed it, at

13  also risk of being a salmon, we would feel that there

14  is absolutely nothing arbitrary about a state boundary.

15  And I believe -- I suspect all 50 states' attorneys

16  general would agree with that.

17          States are a unit of health care based on

18  Medicaid and other insurance policies.  Every state's

19  Blue Cross, for example, is a little different.  States

20  are also a -- have to make their own, to some degree,

21  donor -- not allocation but donor policies.

22          So I'll just make that comment from my region.

1   I'll also make the comment that many members of the

2   Liver Committee expressed the sentiment that they were

3   disappointed that HRSA chose not to defend that policy

4   because they did not feel that that policy -- the

5   previous policy which was reached by consensus by the

6   transplant community, which did move toward decreasing

7   median MELD at transplant, they did not feel that it

8   was arbitrary and capricious.  And there was

9   disappointment, a great disappointment, that our HRSA

10  partners did not defend that.

11          So that's a comment I'll just make and I'll

12  leave it there.

13          MS. DUNN:  Ken Brayman.

14          DR. BRAYMAN:  Right, well, I just want to

15  state again that I think if we were to pass one of

16  these now, there will be a number of unintended

17  consequences.  And I'm respectful of Brian's position,

18  because it is very disconcerting to get a letter --

19  it's kind of like getting a letter from the IRS that,

20  you know, you did something terrible.

21          Well, you know, the OPTN hasn't done anything

22  terrible but it's earth shattering, because it sets a

1          And finally, it really represents the most
2   appropriate common-sense balance of patient need and
3   geographic considerations.  So I kind of think AC
4   weighs patients' needs 60 and the geography 40, where
5   the B2C is just the opposite.  And that 20-point
6   differential is what makes this critical.
7          Thank you for the privilege of the floor.
8          MS. DUNN:  Thank you, Charlie.  I see we have
9   a number of mics lit up.  Yolanda, you're up first.
10         DR. BECKER:  Thank you, Charlie.  Having read
11  and knowing what the Liver Committee has deliberated
12  through, I appreciate everything that you've said about
13  AC and the presentations with AC and B2C.  I would like
14  to point out that the -- and I think everybody knows
15  this -- the Liver Committee's vote was very, very
16  close.
17         As I think you all know, setting precedent of
18  not following our expert committees is not a good
19  precedent to set.  However, I am not in error in
20  speaking that the committee did deliberate and it was a
21  very close vote.  It wasn't overwhelmingly one
22  direction versus another.

1          So I think that, no matter which direction we

2  go, I don't think we are in opposition to the

3  committee.  And I hope that the Liver Committee --

4  Liver and Intestine Committee understands that and,

5  Julie, if you have any perspective on that, I just want

6  to say that either way we go, the vote was close in the

7  committee.

8          DR. MILLER:  I have something to say.  My

9  guess is, if it had been unanimous, I wouldn't be

10  sitting here making this argument.  It was like one

11  vote.  And probably, if you redid the vote five minutes

12  later, it would have been just the opposite.  So that's

13  why we're here today.

14          MS. DUNN:  Tara.

15          MS. STORCH:  Just a couple things.  You know,

16  the longer we wait on deciding this, the more people

17  that are going to die.  And it's really up to us to

18  move this forward.

19          And B2C and Acuity Circles, there really is no

20  perfect model and there's going to be consequences with

21  both.  And as a board, we have to do the best we can.

22          But the question I have is, with the Acuity

1          DR. ORLOFF:  It was just more about when we're

2    flying more, if we go to no DSAs for then kidney

3    allocation, you know, we have lung and heart, I'm just

4    wondering again about the logistics.  But it goes

5    further when -- how can you have that many planes in

6    one place to take the organs to different places?  And

7    I think it was mentioned already that that's been a

8    problem already with the amount of flying in some

9    places.

10          But I think that will be magnified in terms of

11   having enough planes that can transport these organs.

12   So that's just my next comment.  Thank you.

13          MS. DUNN:  Thank you.

14                    M O T I O N

15          All right, we have a motion on the floor and a

16   second.  The vote.  We're going to move on to the vote.

17   What's up on the screen, utilize Acuity Circles for

18   liver distribution.

19          A yes vote means that we would go toward --

20   everything, all subsequent conversations would be

21   around Acuity Circles as the new liver distribution

22   policy.  A no means that we would stay with B2C as the

1  Liver Committee has proposed.

2          So yes, one, means going to Acuity.  Two, or

3  number two, goes to B2C.  And three is abstain.  But

4  we'll take the vote.

5          MS. RHOADES:  The vote is 24 yes, 14 no, zero

6  abstain.

7          MS. DUNN:  Okay.  So if you pull out your

8  updated December 3 sheet, we are shifting gears.  We

9  will not be entertaining any amendments on the B2C

10  side; we now are moving forward as a community with the

11  Acuity Circles.

12          So the next -- the next amendment up, I

13  believe, is number 13, who is Macey.  Macey Henderson,

14  you have the floor.

15          MS. HENDERSON:  Thank you so much.

16          Those in the liver transplant community have

17  long thought that a MELD score of 15 represented a

18  cutoff point to receive benefit for liver transplant.

19  Bob Merion's landmark paper in 2005 showed that

20  patients with a MELD score of 15 did not benefit from a

21  transplant.  In other words, their survival was better

22  on the wait list than it was after transplant.  At that

1  of clarification.  Chris, is what Julie said, with the

2  new NLRB, does that change your thoughts?  Or is

3  that --

4          DR. ANDERSON:  I guess if that's really going

5  to happen, and again I'm not entirely sure how it

6  interacts with Acuity.  I proposed these initially

7  because B2C was what the committee proposed.  So it

8  made sense with that.

9          I think it makes sense if there's going to be

10 a MELD exception elevator such that the median MELD at

11 transplant is artificially elevated for those patients,

12 we need to cap that, I think.  And I also think that it

13 -- just as we've seen in the past, it will interfere

14 with the truly sickest perhaps getting access to

15 organs.

16         So if it's truly capped now, then I will have

17 to say it probably doesn't make any difference.  But

18 when does that take effect, Julie?

19         DR. HEIMBACH:  The NLRB is going live before

20 this policy, at least three months before.  That's the

21 plan.  And it would take effect whenever we go live

22 with the NLRB.