# EXHIBIT 13

JONES DAY

555 SOUTH FLOWER STREET • FIFTIETH FLOOR • LOS ANGELES, CALIFORNIA 90071.2300

TELEPHONE: +1.213.489.3939 • FACSIMILE: +1.213.243.2539

February 13, 2019

<u>Via E-mail and Overnight Courier</u>

The Honorable Alex M. Azar II
Secretary of the U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201
Email:  secretary@hhs.gov

**Re:  OPTN Liver Distribution and Allocation Policy**

Dear Secretary Azar:

This firm represents the organ transplant centers listed below (collectively, the "Centers"), which perform liver transplants across the country and currently provide care to approximately 1,200 transplant candidates who are waiting to receive a donated liver.  On behalf of their patients and physicians, these Centers are deeply concerned about the December 2018 adoption of a new liver allocation policy, which not only fails to comply with the legal requirements for organ allocation policies but also will result in *more patients needlessly dying*.  We ask that you give this letter your immediate attention so that you may grant our request to stay implementation of the new policy or we may seek judicial relief.

This letter serves as a "critical comment" under 42 C.F.R. § 121.4(d) regarding the manner in which the Organ Procurement Transplantation Network ("OPTN") is carrying out its duties.  The Centers respectfully request that you take immediate action and direct the OPTN to set aside the policy approved by the OPTN Board of Directors ("Board") on December 3, 2018 (the "Acuity Circle Policy") and further direct the OPTN to work expeditiously to develop a new, lawful policy.  Because of the risk to the health of patients, the Centers request that you direct the OPTN to suspend implementation of this unlawful policy, currently set for April 30, 2019, which you have the authority to do under section 121.4(d).

**SUMMARY**

The goal of the recent revision of the OPTN's liver allocation policy was to eliminate certain geographic boundaries and to create a policy compliant with the legal regulations governing organ transplantation.  Specifically, the Health Resources and Services Administration ("HRSA"), which oversees the OPTN, instructed the Board to remove references to donation

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 2

service areas ("DSAs") and OPTN Regions in the allocation model because these boundaries were not created "to allocate organs equitably or optimally . . . let alone to improve transplant candidate access to transplantation or [to] address[] the cumulative effects of allocation policies on socioeconomic inequities."[1]

The Centers appreciate the goal of achieving a legally compliant policy and removing arbitrary geographic restrictions. However, by adopting the Acuity Circle Policy, the OPTN failed to develop a compliant policy, and instead stands poised to implement a policy far worse than the status quo, which will send livers from poorer parts of the country to wealthier areas without any legal or medical basis for doing so. Just as HRSA commented about DSAs, acuity circles likewise were not designed to improve patient access to transplants nor were they intended to address socioeconomic inequities in transplantation. Rather, acuity circles look at one small piece of a complex puzzle—the variance in the median of Model for End-Stage Liver Disease ("MELD") scores[2] at the time of transplant, without taking into consideration the imprecision of this metric or weighing other critical variances, such as the significant differences in waitlist mortality across the country. When looking at the whole of liver transplantation, instead of the narrow median MELD metric, it becomes clear that the Acuity Circle Policy will negatively impact lower socioeconomic communities, does not achieve the best use of donated organs, and will result in needless deaths of liver failure patients. As such, the Acuity Circle Policy does not comport with federal regulations and must be set aside.

## LEGAL BACKGROUND

Organ allocation policies are principally governed by two sections within the implementing regulations of the National Organ Transplant Act: 42 C.F.R. §§ 121.4 and 121.8 (collectively the implementing regulations are known as the "Final Rule"). The first regulation sets forth that the OPTN Board is responsible for developing policies that further the OPTN's mission, including organ allocation policies as well as "policies that reduce inequities resulting from socioeconomic status." Specifically, policies to reduce socioeconomic inequities must include the "[r]eform of allocation policies based on assessment of their cumulative effect on socioeconomic inequities." 42 C.F.R. § 121.4(a)(3). Thus, the law *requires* the OPTN to consider how organ allocation policies affect those who are socioeconomically disadvantaged and directs the Board to reform those policies in a way that reduces any inequities. At the

---

[1] Letter from George Sigounas, HRSA Administrator, to Sue Dunn, OPTN President (July 31, 2018), available at https://optn.transplant.hrsa.gov/media/2583/hrsa_to_optn_organ_allocation_20180731.pdf [hereinafter "HRSA July 2018 Letter"].

[2] MELD is a calculation that was designed to capture the severity of a transplant candidate's illness. The Centers recognize the clinical value of laboratory MELD scores, but as described herein, overreliance on the *median* MELD at transplant variance in assessing the equity of organ allocation is medically unsound and legally improper.

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 3

December 2018 OPTN Board meeting, HRSA representative Chris McLaughlin agreed, stating that HRSA's position was that "neither DSAs nor regions were created to allocate organs equitably . . . [o]r to address the cumulative effects of allocation policies on socioeconomic inequities. So the board needs to address that."[3]

Organ allocation policy development is further governed by section 121.8(a), which states:

> (a) **Policy development**. The Board of Directors established under § 121.3 shall develop, in accordance with the policy development process described in § 121.4, policies for the equitable allocation of cadaveric organs among potential recipients.

Notably, this provision begins by explicitly incorporating the guidance in section 121.4 that requires consideration of socioeconomic inequities. Section 121.8(a) then goes on to set forth additional specific requirements for allocation policies.

> Such allocation policies:
>
> (1) ***Shall be based on sound medical judgment***;
>
> (2) ***Shall seek to achieve the best use of donated organs***;
>
> (3) Shall preserve the ability of a transplant program to decline an offer of an organ or not to use the organ for the potential recipient in accordance with § 121.7(b)(4)(d) and (e);
>
> (4) Shall be specific for each organ type or combination of organ types to be transplanted into a transplant candidate;
>
> (5) Shall be designed ***to avoid wasting organs***, to avoid futile transplants, ***to promote patient access to transplantation***, and to promote the efficient management of organ placement;
>
> (6) Shall be reviewed periodically and revised as appropriate;

---

[3] Transcript, OPTN/UNOS Board of Directors Meeting, Open Session, Excerpt: Eliminate the Use of DSAs and Regions in Liver Distribution (Dec. 3, 2018), https://optn.transplant.hrsa.gov/media/2767/board_liver_discussion_transcript_201812.pdf, at 122:2-9 [hereinafter "December Board Meeting Transcript"].

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 4

> (7) Shall include appropriate procedures to promote and review compliance including, to the extent appropriate, prospective and retrospective reviews of each transplant program's application of the policies to patients listed or proposed to be listed at the program; and
>
> (8) ***Shall not be based on the candidate's place of residence or place of listing, except to the extent required by paragraphs (a)(1)-(5) of this section***.

42 C.F.R. § 121.8(a) (emphases added).  Importantly, the Final Rule requires that allocation policies "seek to achieve the best use of donated organs" and "be designed . . . to promote patient access to transplantation."  Moreover, in sub-paragraph (8), the Final Rule expressly permits consideration of a transplant candidate's place of residence to the extent necessary to achieve the best use of donated organs, to avoid wasting organs, and to promote patient access to transplantation.  This permissible consideration of geography was acknowledged by HRSA Administrator, George Sigounas, in a letter to the OPTN President about liver allocation policies.[4]

## FACTUAL BACKGROUND

For several years, the liver transplant community discussed and debated the best way to allocate the limited number of donated livers.  Finally, in December 2017, after protracted deliberations among transplant experts as well as input from the general public, the OPTN Board approved a compromise policy.  Less than a year later—before the approved policy had even taken effect—there was a rush to change (in under six months) the allocation model that was the result of so many years of hard work.  As the OPTN explained,[5] the policy revision's limited timeline was established in the immediate aftermath of a critical comment filed by a New York plaintiffs' attorney, Motty Shulman, which challenged the use of DSAs in liver allocation.  In response to this comment, HRSA directed the OPTN "to adopt a liver allocation policy that eliminates the use of DSAs and OPTN Regions ***and that is compliant with the OPTN final rule***"

---

[4] Letter from George Sigounas, HRSA Administrator, to Sue Dunn, OPTN President (Dec. 19, 2018), at 2; filed in *Cruz v. Dep't of Health & Human Servs.*, No. 18-cv-06371 (S.D.N.Y.), Dec. 21, 2018 (noting that "the OPTN final rule permits geographic limits based on transplant candidates' place of residence or listing only to the extent required by one of the factors described" in sub-paragraphs (a)(1) through (a)(5) in the regulation) [hereinafter "HRSA December 2018 Letter"].

[5] *See* OPTN/UNOS Public Comment Proposal, Liver and Intestine Distribution Using Distance from Donor Hospital at 3, available at https://optn.transplant.hrsa.gov/media/2687/20181008_liver_publiccomment.pdf [hereinafter "Policy Proposal"].

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 5

(emphasis added).⁶  HRSA further directed the OPTN to approve a revised liver allocation policy by its December 2018 Board meeting.

Following HRSA's direction, the OPTN Liver and Intestine Transplantation Committee (the "Committee") published a policy proposal available for public comment from October 8 to November 1, 2018.  The proposal reflected analysis from the Scientific Registry of Transplant Recipients ("SRTR"), which used the liver simulated allocation model to assess the impact of two allocation frameworks—acuity circles and broader 2-circle distribution.⁷  The Committee then voted on its policy recommendation on November 2, less than 24 hours after the public comment period had closed.  During the Committee meeting, one of the OPTN staff members acknowledged that the OPTN had never previously held a committee meeting the day after the public comment period had closed.  As of 9 PM on November 1, many public comments had not yet been posted to the public website or circulated to the Committee.  In fact, the OPTN President later acknowledged that at least 16 comments, all of which had been timely submitted, were not made available to the Committee before the meeting.  During the Committee meeting, the Chair admitted several times that she had not yet read comments submitted by key constituencies, such as the American Society of Transplant Surgeons.  Various members of the Committee repeatedly lamented the fact that the process for such a critical topic was so rushed, noting that they had to make a decision without the same kind of data they usually had for issues of this import.

Nonetheless, acknowledging pressure from HRSA, the Committee acted by a narrow vote to recommend the broader 2-circle distribution model to the OPTN Board.  On December 3, 2018, the OPTN Board discussed the liver allocation policy and voted to approve the Acuity Circle Policy.  During the Board's meeting, several Board members requested that the vote be delayed, but both the Committee Chair and the CEO of the United Network for Organ Sharing ("UNOS")⁸ urged the Board to make a decision because of the pressure from HRSA to adopt a new policy by the close of the Board meeting.⁹  Perhaps because of the rushed process, several Board members made misstatements of fact at the Board meeting (as noted below) that call into question the legitimacy of the Board's action and may have led to the passage of the Acuity Circle Policy, which does not comply with the legal mandates of the Final Rule.

---

⁶ HRSA July 2018 Letter at 3; *see also* Policy Proposal at 5-6 (describing directive from HRSA).

⁷ Scientific Registry of Transplant Recipients, SRTR LI_2018_01, Sept. 24, 2018, https://optn.transplant.hrsa.gov/media/2640/li2018_01_analysis-report_20180924.pdf [hereinafter "SRTR Analysis"].

⁸ UNOS is a non-profit government contractor that operates the OPTN under contract with HRSA.

⁹ December Board Meeting Transcript at 11:12-21, 18:8-22, 111:16-22, 112:9-16, 129:15-130:8.

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 6

      The Centers appreciate the criticisms against DSAs, but the appropriate solution was not to hastily cobble together an allocation policy that itself fails to comply with the Final Rule. The Centers are gravely concerned that the Acuity Circle Policy *decreases* the total number of liver transplants performed in the United States, which results in patients needlessly dying because the system fails to make the best use of donated organs.

### IF THE ACUITY CIRCLE POLICY IS IMPLEMENTED, PATIENTS WILL NEEDLESSLY DIE

      The SRTR modeling shows that the Acuity Circle Policy will result in a decrease in the number of transplants performed nationally.[10] In the Policy Proposal, the OPTN stated that it "could not support an allocation plan that would be very likely to decrease the number of organs transplanted,"[11] but the OPTN's Executive Summary of the Acuity Circle Policy acknowledges that the approved policy does just that and will result in "a slight reduction in the number of transplants overall."[12]

      The SRTR simulation modeling also shows that the Acuity Circle Policy decreases waitlist mortality, which on its face does not make sense. End-stage organ failure patients will die if they do not receive a transplant. If fewer life-saving transplants are performed each year, how can more patients (who need transplants to live) survive? Dr. Terry Therneau of the SRTR Technical Advisory Committee identified this issue as early as 2011, when he noted that one problem with the liver simulation modeling approach to waitlist mortality was "that it strongly overstates our success and ignores the failures." Dr. Therneau explained that the modeling "provid[ed] only short-term predictions" based on deaths expected to occur within the next twelve months, but it "label[ed] any results as 'lives saved' rather than the more truthful 'deaths deferred until next year.'"[13] The reality is that by performing fewer transplants, more patients will die, even if those deaths do not appear in the one-year simulation outcomes. Because the

---

[10] SRTR Analysis at 7.

[11] Policy Proposal at 8.

[12] OPTN, Executive Summary of OPTN Approval of Policies to Eliminate the Use of DSAs and Regions in Liver Allocation, Dec. 13, 2018, at 10; filed in *Cruz v. Dep't of Health & Human Servs.*, No. 18-cv-06371 (S.D.N.Y. Dec. 21, 2018) [hereinafter "Executive Summary"]. In addition, the Liver Committee had concluded that "transporting 70% of the organs by air was not feasible" because of the scarcity of flights and pilots. Policy Proposal at 20. However, under the Acuity Circle Policy it is estimated that 71.4% of organs will be flown. SRTR Analysis at 6. Increased air travel is correlated with increased organ discards as well as greater risk for transplant procurement teams, which experience a risk of fatality on procurement flights that is 1000 times greater than traveling on scheduled commercial flights. *See* M. Englesbe & R. Merion, *The Riskiest Job in Medicine: Transplant Surgeons and Organ Procurement Travel*, 9 AM. J. TRANSPLANTATION 2406 (2009).

[13] SRTR Technical Advisory Committee Meeting, Minutes (July 14, 2011) (on file with author).

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 7

Acuity Circle Policy reduces the number of transplants, more patients will die under this allocation policy.

In the OPTN's Executive Summary discussing the policy change, the OPTN states "[t]he reduction of deaths on the waitlist was considered a measure of best use of transplanted organs, and was an influencing factor in the Board's ultimate decision to adopt the Acuity Circles model."[14] Similar opinions were expressed during the December OPTN Board meeting. For example, in presenting slides on waitlist mortality, Committee Chair Julie Heimbach stated that all proposals moved waitlist mortality "in the right direction though with different degrees," but the acuity circle made "a bigger difference on this important end point."[15] Another OPTN Board member, Charles Miller, stated that the acuity circle model performed the "best . . . with respect to waiting list mortality. It is in the data."[16] Therefore, a fundamental principle driving the OPTN's decisionmaking was an understanding based on simulation modeling data that the acuity circle model would reduce mortalities. But based on the concerns identified by Dr. Therneau, this understanding was wrong.

Moreover, as compared to both the December 2017 and current allocation policies, the Centers are deeply concerned that the Acuity Circle Policy will actually increase waitlist mortalities, even in the short-term period included in the SRTR's liver simulation modeling. As part of the data released on actual transplant candidates and centers (contrasted with the simulated modeled numbers), the SRTR publishes the waitlist mortality rates of each DSA. These rates vary significantly, from a low of .074 to a high of .355 (a nearly fivefold difference).[17] However, the SRTR does not consider these varying mortality rates in its calculations to predict waitlist mortalities under a proposed allocation policy. Rather, the SRTR

---

[14] Executive Summary at 11. Notably, at the December Board meeting, James Alcorn, the UNOS Director of Policy, equated achieving "the best use of donated organs" not with a reduction of deaths on the waitlist but rather with increasing the number of transplants. Mr. Alcorn then noted that the proposed policy revisions would not increase the number of transplants because "that wasn't the goal of this specific allocation policy." December Board Meeting Transcript at 84:1-2. But the Final Rule does not allow for exclusion of the "best use" requirement set forth in 42 C.F.R. § 121.8 just because that was not UNOS's "goal" for the policy. The regulation states that "allocation policies . . . shall seek to achieve the best use of donated organs" and that allocation policies shall not be based on a candidate's place of residence except, among other things, to the extent required "to achieve the best use" of the organ. Therefore, the OPTN/UNOS must *always* consider how to achieve the best use of donated organs when developing allocation policies, especially when the stated goal of such policy is to adjust the use of geographic boundaries related to the candidate's place of residence. This stated goal cannot properly be accomplished without considering the best use of the precious gift of donated organs because the "best use" may require consideration of geographic boundaries that would otherwise not be permitted.

[15] December Board Meeting Transcript at 25:18-26:3.

[16] *Id.* at 144:14-15.

[17] SRTR Spring 2018 Cohort Program-Specific Report Data (on file with author).

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 8

model assumes that waitlist mortality rates are roughly the same across the country.  Therefore, the SRTR model underestimates the deaths that will result from the Acuity Circle Policy, particularly in areas with higher waitlist mortality rates.  Preliminary analysis by the Centers demonstrates that once the variation in waitlist mortality across DSAs is considered, *the number of waitlist deaths nationally is higher under the Acuity Circle Policy* than the SRTR modeling indicated.  Prior SRTR modeling further exemplifies the inaccuracies in how the SRTR predicts waitlist mortalities.  For example, a 2015 analysis predicted that under a then-proposed policy, the South Carolina DSA—which has the fifth highest waitlist mortality rate in the country—would perform thirty percent fewer transplants without any change to its waitlist mortality.[18]  It is incomprehensible how performing thirty percent fewer transplants in an area with a significantly high waitlist mortality rate would not result in an increased number of waitlist deaths.

      In addition, the OPTN Board acknowledged during its December meeting that the SRTR models had not taken into consideration transplant candidates who were removed from the waitlist because they had become too sick to transplant.  Of course, because these individuals will invariably die without receipt of a liver, they should be treated as deaths when evaluating whether an allocation policy "achieves the best use of donated organs."  The SRTR representative at the Board meeting explained that the SRTR had one simulated calculation that considered deaths following removal from the waitlist, but the analysts had been unable to run this calculation because of the "short time line."[19]  As with the DSA waitlist mortality rates, the SRTR also makes publicly available data from actual transplant experience that identifies the number of transplant candidates who were removed from waitlists because they were too sick to transplant.  This data could be used in the liver simulation model to enhance the accuracy of the model's calculation of expected deaths resulting from any proposed policy.

      Based on preliminary analysis, when the SRTR simulation model is appropriately refined by taking into account the data regarding variations in mortality rates across DSAs and candidates who are too sick to transplant, the model shows a very different picture than the OPTN Board assumed to be true.  Instead of decreasing the number of deaths, preliminary results from a refined model show the Acuity Circle Policy *increases* the number of deaths across the

---

[18] SRTR Final Analysis, *Data Request from the OPTN Liver and Intestinal Organ Tranpslantation Committee: Supply/Demand Ratios, Proximity Points, and Additional Financial Analyses* (June 21, 2015), Tables I45 and I47, https://optn.transplant.hrsa.gov/media/2678/201502_srtr_liver_analysis_report.pdf.

[19] December Board Meeting Transcript at 78:2-9.

The Honorable Alex M. Azar II
February 13, 2019
Page 9

country. A "revised" policy that increases the number of deaths and decreases the number of transplants is a change that moves in the wrong direction.[20]

## THE ACUITY CIRCLE POLICY DOES NOT COMPLY WITH THE LAW

Under the Final Rule, the OPTN Board is responsible for developing policies that further the OPTN's mission, including "policies that reduce inequities resulting from socioeconomic status." 42 C.F.R. § 121.4(a)(3). Such policies must include the "*[r]eform of allocation policies based on assessment of their cumulative effect on socioeconomic inequities*." *Id.* § 121.4(a)(3)(iv) (emphasis added). In addition, under Section 121.8, the OPTN Board of Directors is instructed to design organ allocation policies "to promote patient access to transplantation." Therefore, when developing allocation policies for any organ (not just liver), the law requires the OPTN to (i) consider how the organ allocation policy will affect those who are socioeconomically disadvantaged, (ii) seek to reform the allocation policy in a way that reduces socioeconomic inequities, and (iii) design the allocation policy in a way that will advance patient access to transplantation. With the adoption of the Acuity Circle Policy, the OPTN has failed to meet these legal requirements.

**A.      The law requires the OPTN to develop policies that reduce socioeconomic inequities, but the SRTR data models indicate that transplant candidates in lower-socioeconomic status, higher-risk communities will suffer under the Acuity Circle Policy.**

The OPTN failed to reform the liver allocation policy in a manner that reduces disparities based on an assessment of the policy's effect on socioeconomic inequities, as required by the Final Rule. *See* 42 C.F.R. § 121.4(a)(3). In a letter to the OPTN regarding the revised liver allocation policy, HRSA states that "the OPTN analyzed the impacts of the potential policy on various demographic groups, including racial and ethnic minorities, [and] those disadvantaged by lower socioeconomic status" and notes that the OPTN "found these groups would not be

---

[20] Allocation policies for lung and kidney donated organs have also recently removed DSAs, and initial data following the implementation of these policies demonstrates that the policy changes increased the number of organ-failure deaths nationwide. The lung allocation policy was hastily changed in November 2017 as a result of litigation brought by the same attorneys seeking change to the liver allocation policy. Based on the first nine months of data collection following implementation, there was an increase in the overall death rate, a decrease in the overall transplant rate, a decrease in donor utilization, and an increase in the number of discarded organs. *See* OPTN Thoracic Transplantation Committee, *Monitoring of the Lung Allocation Change, 9 Month Report Removal of DSA as a Unit of Allocation* (Oct. 25, 2018), https://optn.transplant.hrsa.gov/media/2730/20181025_thoracic_committee_report_lung.pdf. Data from the first two years of the kidney allocation policy show an increase in organ discards and decrease overall transplant recipient survival. *See* Amber R. Wilk, John Beck, & Anna Y. Kucheryavaya, *The Kidney Allocation System: The First Two Years* (Apr. 19, 2017), https://www.transplantpro.org/wp-content/uploads/sites/3/KAS_First-two-years_041917.pdf.

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 10

disadvantaged by the policy changes."[21]  But HRSA's assertion is not supported by the facts.  The only time socioeconomic status was mentioned during the December Board meeting was when OPTN Board members suggested that the policy development process had *failed* to consider socioeconomic inequities.[22]  As explained below, the record reflects that the OPTN did not actually consider the impact of the allocation model on lower socioeconomic groups.  Even if HRSA's observation were correct, the law requires allocation polices to *reduce* socioeconomic inequities; merely concluding that certain population groups are not being "disadvantaged" by a policy is not the same as pursuing policies that "reduce" socioeconomic inequities.

While not hesitating to rely on the imperfect SRTR model for waitlist mortality, the OPTN disregarded that same model's analysis of the Acuity Circle Policy's impact on impoverished areas.  Based on the SRTR's assessment of Cumulative Community Risk Scores ("CCRS"), the Acuity Circle Policy will have significant detrimental effects on transplant candidates in high-risk, low socioeconomic communities.  When compared to the current and the December 2017 Board-approved policies, the Acuity Circle Policy *decreases* transplant rates for *the highest risk* (lowest socioeconomic status) communities and *increases* transplant rates for *the lowest risk* (highest socioeconomic status) communities.[23]  However, during the OPTN Board meeting, the Liver Committee Chair erroneously stated that the Committee looked at "community risk score" and other demographic factors and found that the only area where there was a difference was age.[24]  In fact, the Committee's meeting minutes indicate that Committee members found that "concerns about socio-economic status are legitimate."[25]  Moreover, the SRTR modeling presented to the Committee shows not only that the Acuity Circle Policy fails to reduce socioeconomic inequities, as required by law, but the policy actually appears to *increase* socioeconomic inequities regarding access to transplantation as evidenced by the CCRS data.

These defects are further illuminated by analyzing the models from a regional perspective.  Notably, the states with the highest mean of CCRS risk scores (i.e., the states with the greatest number of high-risk communities) are in Regions that will have their number of transplants *reduced* by the Proposal.  Based on modeling from kidney research, Region 3 and

---

[21] December 2018 HRSA Letter at 4.

[22] December Board Meeting Transcript at 97:5-20, 114:10-12, 120:7-10.

[23] SRTR Analysis at 287 (showing that the transplant rate for high-risk, low socioeconomic communities, with CCRS scores ranging from 30 to 40, decreases from approximately 0.58 transplants per patient-year to 0.48 transplants).

[24] December Board Meeting Transcript at 98:2-11.

[25] OPTN/UNOS Liver and Intestinal Organ Transplantation Committee, Meeting Minutes (Nov. 2, 2018), at 8, available at https://optn.transplant.hrsa.gov/media/2775/20181102_liver_committee_minutes.pdf [hereinafter November 2018 Liver Committee Minutes].

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 11

Region 11 have some of the highest average CCRS risk scores in the country (indicating lower socioeconomic status);[26] yet, the transplant rates and number of transplants for both of these Regions *decrease* under the proposed models.[27] By contrast, transplant rates and the number of transplants for Regions 1 and 9 increase, and on average, these Regions have the lowest CCRS risk scores.[28] Therefore, contrary to the representations made by HRSA, the Acuity Circle Policy will undoubtedly "disadvantage" and adversely impact lower socioeconomic status communities.

Professional analyses outside of the SRTR models provide further support for why it is critically important that the OPTN comply with the law and address socioeconomic inequities in organ allocation policies. One study found that end-stage liver disease patients living in communities with higher CCRS scores had a significant increase in overall mortality risk and that higher CCRS scores were statistically correlated with lower waitlist survival.[29] Moreover, regions that are typically viewed as having "excess" organs to share with other regions that have a higher median MELD at transplant have waitlist mortality rates nearly twofold higher than those regions that stand to benefit from broader sharing.[30] Among the general population in high-risk CCRS communities, the death rate from end-stage liver disease is almost twice that of communities in the lowest risk tier, but fewer candidates are listed in high-risk CCRS communities for each person dying from liver disease, suggesting an inequity in access to the waitlist. Other studies have shown that lower socioeconomic status patients with hepatocellular carcinoma have delayed access to the waitlist.[31]

Thus, based on the very data presented to the OPTN from the SRTR simulation models in addition to other evidence available in the liver transplant community, it is evident that the Acuity Circle Policy will have significantly detrimental effects on the most needy patients and communities. If the OPTN had seriously considered the cumulative effect of allocation policies on socioeconomic inequities, as required by 42 C.F.R. § 121.4, it would not have approved the Acuity Circle Policy.

---

[26] J. Schold et al., *The Association of Community Health Indicators with Outcomes for Kidney Transplant Recipients in the United States*, 147 ARCH. SURGERY 520, 525 Fig. 3 (2012).

[27] SRTR Analysis at 50, 58, 61, 69.

[28] SRTR Analysis at 48, 56, 59, 67.

[29] K. Ross et al., *Sociodemographic Determinants of Waitlist and Posttransplant Survival Among End-Stage Liver Disease Patients*, 17 AM. J. TRANSPLANTATION 2879, 2882 (2017).

[30] *Id.* at 2879.

[31] O. Hyder et al., *Referral Patterns and Treatment Choices for Patients with Hepatocellular Carcinoma: A United States Population-Based Study*, 217 J. AM. COLLEGE. SURGEONS 896 (2013).

The Honorable Alex M. Azar II
February 13, 2019
Page 12

### B.   The OPTN erroneously assumes allocation models do not need to promote patient access to transplantation for all patients with end-stage organ failure.

The OPTN's Policy Proposal acknowledged that under the Final Rule, "the OPTN shall develop allocation policies that 'promote patient access.'"[32]  Yet the proposal then expressed the OPTN's inexplicably narrow interpretation of "patient" by stating: "[T]he OPTN has interpreted these requirements to apply to patients who are registered for organ transplantation – as opposed to all patients with end stage organ failure, who may or may not be registered for organ transplantation."  Following this narrow interpretation, the proposed liver allocation policy has *not* been designed to promote "patient" access to transplantation, but rather has considered access to transplant only for those *candidates* already on the waiting list.  Such an interpretation is wholly inconsistent with the plain language and intent of the Final Rule.

As quoted above, the Final Rule states that the OPTN shall design allocation policies "to promote patient access to transplantation." 42 C.F.R. § 121.8(a)(5).  The term "patient" is not defined by the regulation, but "transplant candidate" is defined to mean "an individual who has been identified as medically suited to benefit from an organ transplant *and has been placed on the waiting list* by the individual's transplant program." 42 C.F.R. § 121.2 (emphasis added).  If the Final Rule intended "patient access" to be limited to those already on the waitlist, it would have used the word "candidate" instead of "patient."  In fact, the regulation used the word "candidate" later in the same rule—in paragraph (a)(8), the text sets forth that allocation polices "[s]hall not be based on the *candidate's* place of residence, or place of listing, except to the extent required by paragraphs (a)(1)-(5) of this section."  According to legal canons of construction, when different words are used in the same statute or rule, a different meaning is conveyed by each word.[33]  Therefore, under paragraph (a)(5), the OPTN is instructed to design allocation policies that promote all *patients'* access to transplantation (not just access for those on the waiting list).

Moreover, the legislative and regulatory history make clear that the government intended the OPTN to develop policies that consider socioeconomic factors affecting *access to the waitlist*, not just candidates' access to organs once waitlisted.  For example, when describing section 121.4(a)(3) in the preamble guidance published with the Final Rule, HRSA stated in 1998 that this provision was added to the rule in response to issues raised at a public hearing.  This new provision was to require that "the OPTN modify or issue policies to reduce inequities resulting from socioeconomic status *to help patients in need of a transplant be listed* and obtain

---

[32] Policy Proposal at 31.

[33] *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983); *Race Tires Am. Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158 (3d Cir. 2012); *SEC v. McCarthy*, 322 F.3d 650 (9th Cir. 2003); *Russell v. Law Enforcement Assistance Admin.*, 637 F.2d 354, 356 (5th Cir. 1981).

The Honorable Alex M. Azar II
February 13, 2019
Page 13

transplants." 63 Fed. Reg. 16,296, 16,309 (Apr. 2, 1998). Shortly after this guidance and the Final Rule were released, Congress intervened and suspended the rule's implementation until October 21, 1999 because of concerns from the transplant community as well as the general public.[34] During hearings on the matter, legislators and witnesses expressed concerns about the so-called "green screen," which was a term used to describe the inability of low-socioeconomic status individuals to access the waiting list, particularly for non-renal transplantation that was not necessarily covered by Medicare.[35] As part of the public debate, Congress asked the Institute of Medicine ("IOM") to conduct a study on the potential impact of the Final Rule.[36] Among other things, Congress asked the IOM to examine "access to transplantation services for low-income populations and racial and ethnic minority groups."[37]

In its report, the IOM expressly considered both access to the waiting list as well as access to organs once candidates were waitlisted. Under the heading "Factors Affecting Access," the IOM began by referring to "[f]actors that might influence waiting list entry."[38] According to the report, once a patient was placed on the waiting list, socioeconomic status had little influence on whether that candidate received a transplant. Rather, the "***primary barrier***" in access to transplantation "for poor people as a group ***was gaining access to the waiting list***."[39] *Id.* More specifically, the IOM explained that "[l]ower access by African Americans to kidney transplantation is well documented. Much of the disparity appears to be due to the fact that African Americans are not placed on waiting lists as quickly, or in the same proportion, as their white counterparts."[40] For liver transplants, the IOM reported "that African Americans enter the list and receive liver transplants when they are sicker, relative to other racial groups." The Report concluded that "initial access to health care and to referrals for transplant evaluation is an important impediment for African Americans with liver disease."[41]

---

[34] *See* 112 Stat. 2681, 359-360, Pub. L. No. 105-277, § 213.

[35] *See* Joint Hearing Before the House of Representatives Subcommittee on Health and Environment of the Committee on Commerce and the Senate Committee on Labor and Human Resources, 105th Cong., 2nd Sess., June 18, 1998.

[36] INST. OF MED., ORGAN PROCUREMENT AND TRANSPLANTATION: ASSESSING CURRENT POLICIES AND THE POTENTIAL IMPACT OF THE DHHS FINAL RULE 3 (1999), *available at* https://www.ncbi.nlm.nih.gov/books/NBK224647/pdf/Bookshelf_NBK224647.pdf [hereinafter "IOM Report"].

[37] *Id.* at 3.

[38] *Id.* at 41.

[39] *Id.*

[40] *Id.* at 40.

[41] *Id.*

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 14

      After reviewing the IOM Report, at the end of the Congressionally-imposed suspension of the Final Rule, HRSA released an amendment to the Final Rule in 1999, which included the language at issue here from Section 121.8(a)(5) requiring that allocation policies "promote patient access to transplantation." The rulemaking explained that paragraph (a)(5) was added specifically in response to "an issue Congress asked the IOM to address." *Id.* at 56,656. HRSA further stated that it "relied heavily on the guidance in the IOM report"—the guidance that concluded the "primary barrier" to patient access to transplantation was access to the waitlist.

      Congress had significant concerns about the ability of low-income populations and ethnic minority groups to have access to transplantation services. In supporting implementation of the amended Final Rule, Congress directed the OPTN and HRSA to carefully weigh the impact of socioeconomic factors in accessing transplantation services, including access to the waitlist. However, in discussing this issue at the OPTN Board meeting, the Chair of the Liver Committee acknowledged that the Committee's actions had not fully addressed waitlist access, noting "[t]here's a whole bunch of unmeasured people, no doubt" that were not included in the policy assessment.[42] Chris McLaughlin, the HRSA representative at the December 2018 OPTN Board meeting, then defended the OPTN's erroneous regulatory interpretation by stating, without legal or factual support, that in many instances, the Final Rule's references "to patients and transplant patients are best understood as references to transplant candidates, at least to persons who are patients of a transplant program and may soon be put on the waiting list, and not to the broader set of individuals who may benefit from organ transplantation."[43] Such an interpretation is completely inconsistent with the legislative and regulatory history of the Final Rule. HRSA cannot twenty years later change the plain text of its regulation without notice and comment rulemaking. Conflating the meaning of the word "patient" and "candidate" in this case is an arbitrary and capricious act.

      The Final Rule requires allocation policies to "promote patient access to transplantation," which at the time of the rule's promulgation, was understood to mean promoting access to transplantation for all end-stage organ disease patients, including those not yet on the waitlist, because the "primary barrier" to transplant access was access to the waitlist. The OPTN has admitted that it did not consider access to the waitlist when evaluating the impact of the Acuity Circle Policy. Because the OPTN has failed to adequately consider an aspect of the problem that Congress deemed vital and that is required to be considered under the Final Rule, the Acuity

---

      [42] December Board Meeting Transcript at 93:6-22.

      [43] December Board Meeting Transcript at 119:1-7; *see also* Executive Summary at 12 ("A representative from HRSA reinforced at the Board meeting that it was appropriate for the Board to consider promoting access for candidates, as opposed to all patients, which would include patients not registered on the waiting list.").

The Honorable Alex M. Azar II
February 13, 2019
Page 15

Circle Policy is legally untenable, and the Secretary should direct the OPTN to develop a policy that promotes access to transplantation for all end-stage liver failure patients as required by law.

### C. Median MELD at transplant is a flawed metric to assess the geographic equity of a liver allocation policy.

In addition to removing DSAs and Regions from the allocation policy, the OPTN's stated primary goal in the liver allocation policy development was to "reduce the variance in geographic disparities to access."[44] The OPTN stated that it intended to accomplish this goal by reducing the geographic variance in median allocation MELD at transplant or "MMaT."[45] The OPTN's Executive Summary of the Acuity Circle Policy reiterates the importance of MMaT, noting that the "[t]he goal is to have as little variance as possible, which would indicate that candidates with relatively similar levels of need are receiving organ offers at similar rates."[46]

The OPTN assumes that a lower MMaT in one region means that healthier candidates in that region are unfairly being transplanted while sicker candidates who live in another part of the country remain on the waitlist. But this assumption ignores fundamental realities of liver transplantation, including variations in waitlist mortality. The OPTN cannot look simply at MMaT in a vacuum and disregard other known factors that reflect a candidate's likelihood of mortality. MELD was intended to reflect the transplant candidate's severity of illness and likelihood of mortality, but if, as discussed above, mortality risk is actually affected by some combination of severity of illness as well as non-clinical factors[47] (including socioeconomic status and the ability to access the waitlist and quality health care), then an infrastructure designed to reduce the variance in median MELD at transplant is addressing only part of the problem. Looking at the full context of end-stage liver disease, the "best use" of a donated liver

---

[44] Policy Proposal at 7.

[45] *Id.* at 19. In 2012, the OPTN Board directed all organ-specific committees to identify "allocation equity metrics" to assess allocation policies. *See* OPTN Briefing Paper, Enhancing Liver Distribution, https://optn.transplant.hrsa.gov/media/2329/liver_boardreport_201712.pdf, at 1. In 2014, the Liver Committee discussed in a concept paper the variance in the median MELD score at transplant across DSAs. *See* OPTN/UNOS Liver and Intestinal Organ Transplantation Committee, Redesigning Liver Distribution to Reduce Variation in Access to Liver Transplantation, https://optn.transplant.hrsa.gov/media/1269/liver_concepts_2014.pdf, at 9. This metric has since become the primary metric for evaluation of liver allocation policies, but the Centers urge reconsideration of this metric because of the issues discussed herein.

[46] Executive Summary at 12.

[47] *See* Schold, *supra* note 26 at 524 (finding that non-clinical factors may explain more variation in patient outcomes than many factors considered clinically relevant).

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 16

may be to allocate the organ to the candidate most likely to die, even if that individual is not the "sickest" based on MELD score.

Further, an overemphasis on MMaT as the primary metric indicative of geographic equality ignores the reality that surgical practices are a significant factor in MMaT variances. Not all donated organs are of equal quality, and in addition to basic donor-recipient matching considerations, some transplant programs are disproportionately willing to use higher risk (or marginal) organs. Transplant programs that are more aggressive usually use such marginal livers in lower MELD recipients because it is thought that those marginal organs may be successfully transplanted to healthier recipients who can better tolerate a poor initial function of the liver graft.[48] Programs that are successfully able to use these marginal organs may have a lower MMaT than those programs that use higher quality organs on sicker recipients, but this does not necessarily mean that there is an unfair allocation of organs.

The OPTN acknowledges the likelihood of marginal organs affecting MMaT but only in the context of organs that are accepted from donor hospitals more than 500 nautical miles away. The Acuity Circle Policy excludes these organs from MMaT calculations because they are likely "more aggressive transplants" and "including them in the MMaT calculation could potentially serve as a disincentive to use [] these organs."[49] However, the Acuity Circle Policy does not take into consideration that certain transplant centers may be effectively using such marginal organs regardless of where the donor was located, which affects the center's MMaT. If certain centers have developed expertise in using these otherwise discarded organs in healthier candidates, they will perform the transplant regardless of the distance from the donor organ. The Acuity Circle Policy does not account for such use of marginal organs.

Finally, MELD scores do not definitively capture the medical urgency of the candidate receiving the transplant. One well-known factor affecting regional variation in MMaT is the difference in regional approval rates for symptom-based exceptions, which, if granted, increase the recipient's MELD score at transplant. These exceptions are not given to equally sick candidates equally across the country. Research has demonstrated "that there are clear regional differences in [exception] award practices irrespective of organ availability," and Region 9 (New York and western Vermont) has a statistically significant higher rate of exception approvals when compared to other Regions.[50] The OPTN has acknowledged that exception approvals vary

---

[48] *See* L. McCormack et al., *Rescue Policy for Discarded Liver Grafts: A Single-Centre Experience of Transplanting Livers 'That Nobody Wants,'* 12 HPB 523 (2010).

[49] Policy Proposal at 24.

[50] C. Argo, et al., *Regional Variability in Symptom-Based MELD Exceptions: A Response to Organ Shortage?*, 11 AM. J. TRANSPLANTATION 2353, 2358 (2011).

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 17

by Region, with some Regions approving as few as 75.8% of exception requests and other Regions approving 93.5% of requests made during the same time period.[51] However, the OPTN has failed to consider that when exception points are standardized, the MMaT variances may be significantly reduced, even without any change to the allocation policy. It is improper to make a fundamental change in policy based on a premise of inequality that is grounded in a flawed metric, which once corrected may reveal there was no inequity to begin with.

Moreover, when organs were allocated based in part on DSAs and Regions, the regional exception variances were not as influential in determining which candidates received donated organs because all candidates within the same Region received exception points at the same rate. However, under the Acuity Circle Policy, organs may cross Regions and DSAs, and therefore candidates in Regions with higher rates of exception point approvals will be more likely to receive organs as compared to candidates in Regions with lower rates of approval. To try to correct the variances, the OPTN was set to implement a National Liver Review Board ("NLRB") to promote consistent, evidence-based review of exception requests and award of exception points. Because of the impact of exception points under the new allocation model, the vast majority of the Liver Committee voted in favor of delaying the implementation of any change in allocation policy until at least three months after the NLRB was implemented to allow time for the national reviewers to normalize some of the regional variation in exception point allocation.[52] This three-month gap was also discussed at the OPTN December Board meeting, where the Committee Chair noted that both the NLRB and allocation policy are "major changes" and "to put these two too close together, we felt, would be asking for significant trouble."[53] During the Board's discussion of the Acuity Circle Policy, the Committee Chair explicitly stated that "[t]he NLRB is going live before this policy, at least three months before. That's the plan."[54] The NLRB had been scheduled to begin on January 31, 2019, three months before the go-live date of the Acuity Circle Policy on April 30, 2019. However, on January 30, 2019, UNOS staffers notified review board members that the NLRB implementation had been postponed and would not take effect until after a public comment period ending on March 22, 2019. UNOS stated that the Acuity Circle Policy implementation date was still set for April 30, 2019. Therefore, the

---

[51] OPTN/UNOS Liver and Intestinal Organ Transplantation Committee, *Liver Review Board Guidance Documents*, at 2, https://optn.transplant.hrsa.gov/media/2175/liver_boardreport_guidance_201706.pdf.

[52] November 2018 Liver Committee Minutes at 12. Each candidate with exception points is re-reviewed every three months, so after a three-month period nearly all of the candidates should have been reviewed under the new national review board.

[53] December Board Meeting Transcript at 49:2-7; *see also id.* at 67:20-22, 68:1-3 (stating that in terms of the timeline, the NLRB would be implemented in the first quarter of 2019 and the allocation policy would be "at least three months and maybe more months" after that).

[54] *Id.* at 180:19-21.

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 18

NLRB, which the Committee and Board understood would go live at least three months before the Acuity Circle Policy, will now take effect only one month (or less) before the scheduled implementation of the Acuity Circle Policy. By implementing both the NLRB and a new allocation policy simultaneously, in the words of the OPTN's Liver Committee Chair, the OPTN is "asking for significant trouble."

Ultimately, MMaT was intended to be a metric to assess variance in organ access and equalize mortality risk, but this metric has not served to achieve its goals. For example, the waitlist mortality in South Carolina has been as much as five times higher than the waitlist mortality in New York, even though allocation MMaT is higher in New York.[55] The OPTN acknowledged this fact in its annual data report, noting that "[w]aitlist mortality rates varied substantially by geography." The report goes on to explain that "[m]ortality did not mirror transplant rates, suggesting that *waitlist outcomes were determined by factors other than simply organ availability*, including referral and waitlist registration practices and possibly pretransplant patient management and quality of care."[56] And yet, in approving the Acuity Circle Policy, the OPTN continued to seek to equalize MMaT variances across DSAs without regard to variations in waitlist mortality rates across DSAs, access to quality care, and other factors identified as outcome determinative in the OPTN's own report. As noted above, factoring in these varying waitlist mortality rates suggests that *the Acuity Circle Policy will increase deaths nationwide*, which cannot be consistent with the Secretary's goals.

## CONCLUSION

The Centers, their physicians, and patients share a common goal with HHS—we want the scarce and precious gift of donated organs to be allocated in such a way as to enable patients to have equitable access based on medical urgency in compliance with the factors delineated in the Final Rule. The OPTN Board erroneously concluded that the best way to do this is by focusing almost exclusively on median MELD at transplant variances and relying on flawed SRTR modeling of waitlist mortality. The Board's approach ignores fundamental realities of our health care system, imperfections in the MELD calculations, imprecisions in the SRTR modeling, and its legal obligation to promote access to transplantation for all end-stage organ failure patients. Moreover, the Board failed to address the cumulative effects of allocation policies on socioeconomic inequities, which HRSA explicitly instructed the Board to address, and thus the approved policy fails to "reduce inequities resulting from socioeconomic status." If organs are

---

[55] David A. Gerber, Prabhakar Baliga, & Seth J. Karp, *Allocation of Donor Livers for Transplantation: A Contemporary Struggle*, JAMA Surgery (June 20, 2018), https://jamanetwork.com/journals/jamasurgery/article-abstract/2685267.

[56] W.R. Kim et al., *OPTN/SRTR 2016 Annual Data Report: Liver* (Jan. 2, 2018), https://onlinelibrary.wiley.com/doi/full/10.1111/ajt.14559 (emphasis added).

JONES DAY

The Honorable Alex M. Azar II
February 13, 2019
Page 19

allocated according to the Acuity Circle Policy, transplant candidates and end-stage organ failure patients, particularly those in lower socioeconomic communities, will needlessly die.

We ask you to direct the OPTN to suspend implementation of the Acuity Circle Policy and to develop a legally compliant policy. If you do not take such action, we intend to pursue available judicial remedies.

Respectfully,

Glenn Krinsky

On behalf of:
    Emory Healthcare
    Henry Ford Health System
    Indiana University Health
    Michigan Medicine
    Piedmont Healthcare
    Saint Luke's Health System
    The University of Kansas Health System
    Vanderbilt University Medical Center
    VCU Health System
    Washington University in St. Louis/Barnes-Jewish Hospital Transplant Center