# EXHIBIT C

## Alexandra Glazier Deposition Excerpts

## Glazier Deposition Exhibit 36

CONFIDENTIAL

```
 1                                  Volume I
                                    Pages 1 to 262
 2                                  Exhibits 1 to 45
 3             IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 4                       ATLANTA DIVISION
 5     - - - - - - - - - - - - - - - - -x
                                        :
 6      RANDALL CALLAHAN, et al.,       :
                   Plaintiffs,          :
 7                                      :
              vs.                       :    Civil Action
 8                                      :    No.
        UNITED STATES DEPARTMENT OF     :    1:19-cv-1783-AT
 9      HEALTH AND HUMAN SERVICES       :
        through XAVIER BECERRA in his   :
10      official capacity as            :
        Secretary of the United         :
11      States Department of Health     :
        and Human Services, and         :
12      UNITED NETWORK FOR ORGAN        :
        SHARING,                        :
13                   Defendants.        :
                                        :
14     - - - - - - - - - - - - - - - - -x
15            CONFIDENTIAL VIDEOTAPED DEPOSITION OF
       ALEXANDRA GLAZIER, a witness called by counsel for
16     the Plaintiffs, taken pursuant to the Federal Rules
       of Civil Procedure, before Jane M. Werner,
17     Registered Merit Reporter and Notary Public in and
       for the Commonwealth of Massachusetts, at the
18     Offices of Jones Day, 100 High Street, Boston,
       Massachusetts, on Thursday, July 13, 2023,
19     commencing at 9:09 a.m.
20
21
22
23
24
                                                    Page 1
```

```
 1    PRESENT:
 2         Canfield Law LLC
                (by Peter Crane Canfield, Esq.)
 3              34 Inman Circle NE, Atlanta, GA 30309
                678.296.5413
 4              pccanfield@gmail.com
                     -and-
 5         Jones Day
                (by Will R. Taylor, Esq.)
 6              717 Texas Street, Suite 3300, Houston, TX
                77002,
 7              832.239.3860
                wrtaylor@jonesday.com
 8                   -and-
           Jones Day
 9              (by Ann Hollenbeck, Esq.)
                150 W. Jefferson Avenue, Suite 2100,
10              Detroit, MI 48226
                313.733.3939
11              ahollenbeck@jonesday.com
                     -and-
12         Jones Day
                (By Glenn Krinsky, Esq.)
13              555 S. Flower Street, 50th Floor, Los
                Angeles, CA 90071, for the Plaintiffs.
14              213.489.3939
                gkrinsky@jonesday.com
15
           Winston & Strawn
16              (by Thomas G. Weber, Esq.)
                35 W. Wacker Drive, Chicago, IL 60601,
17              for the Defendant United Network for Organ
                Sharing.
18              312.558.3260
                tgweber@winston.com
19
20
21
22
23
24
```

Page 2

```
 1      PRESENT:  (Continued)
 2          Verrill Dana LLP
                    (by Michael K. Fee, Esq., and
 3                  David G. Lazarus, Esq.)
                    One Federal Street, Boston, MA 02110,
 4                  for the deponent.
                    617.309.2600
 5                  mfee@verrill-law.com
                    dlazarus@verrill-law.com
 6
        Also Present:  Shawn Budd, Videographer
 7                     Lisa Paolillo
                       Lisa Newman (via telephone)
 8
                          *  *  *  *  *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

CONFIDENTIAL

```
 1                    I N D E X
 2
      WITNESS:                    DIRECT  CROSS
 3
      ALEXANDRA GLAZIER
 4    (By Mr. Canfield)          11
 5                        *   *   *
 6                  E X H I B I T S
 7    EX. NO.                                  PAGE
 8      Exhibit 1   Document entitled "Exhibit C,
                Declaration of Alexandra K. Glazier
 9              (1/6/20)"                       22
10      Exhibit 2  Declaration of Brian M. Shepard   35
11      Exhibit 3   Memo to OPTN/UNOS Executive
                Committee from OPTN/UNOS Ethics
12              Committee, dated 6/10/13         51
13      Exhibit 4   email chain; top email from Brian
                M. Shepard to Alexandra Glazier,
14              dated 6/23/18, Bates stamped
                UNOS_0018566 to 18568            60
15
        Exhibit 5  email from Alexandra Glazier to
16              Jason Livingston, dated 6/23/18,
                Bates stamped UNOS_0247204 to
17              0247205                          67
18      Exhibit 6  email chain; top email from
                Alexandra Glazier to Brian
19              Shepard, dated 1/18/18, Bates
                stamped UNOS_014422              74
20
        Exhibit 7  email chain; top email from
21              Alexandra Glazier to Melissa
                Greenwald, dated 11/17/17, Bates
22              stamped UNOS_0107628 to 0107629  90
23
24
```

Page  4

```
 1              E X H I B I T S, (Continued)
 2     EX. NO.                                    PAGE
 3       Exhibit 8   email chain; top email from
                 Alexandra Glazier to Brian M.
 4               Shepard, dated 11/21/17, Bates
                 Stamped UNOS_0104403 to 0104404    100
 5
         Exhibit 9     email chain; top email from
 6               Alexandra Glazier to Brian M.
                 Shepard, dated 11/21/17, Bates
 7               stamped UNOS_0253672 to 0253674    104
 8       Exhibit 10  email from Alexandra Glazier to
                 Brian M. Shepard, dated 11/22/17,
 9               Bates stamped UNOS_0144590          114
10       Exhibit 11  email from Alexandra Glazier to
                 Brian M. Shepard, dated 11/22/17,
11               Bates stamped UNOS_0144588 to
                 0144589                             116
12
         Exhibit 12  email chain; top email from
13               Yolanda A. Becker to Brian M.
                 Shepard, dated 11/22/17, Bates
14               stamped UNOS_0144591 to 144595      117
15       Exhibit 13  Memo to George Sigounas from
                 Yolanda Becker dated 11/24/17
16               Bates stamped UNOS_0716471 to
                 0716482                             121
17
         Exhibit 14  email to Brian M. Shepard to Casey
18               A. Humphries, et al., dated
                 11/23/17, Bates stamped
19               UNOS_0716469 to 716470              121
20       Exhibit 15  Letter to The Honorable Amy
                 Totenberg from Peter C. Canfield,
21               dated 10/23/19                      124
22       Exhibit 16  Letter to Michael Drezner from
                 Peter C. Canfield, dated 6/3/19
23               with attachment                     129
24
```

                                        Page 5

Case 1:19-cv-01783-AT Document 385-8 Filed 04/30/25 Page 7 of 49
Case 1:19-cv-01783-AT Document 385-8 Filed 04/30/25 Page 7 of 49
CONFIDENTIAL

```
 1              E X H I B I T S, (Continued)
 2    EX. NO.                                    PAGE
 3      Exhibit 17  email chain; top email from Brian
                M. Shepard to Alexandra Glazier,
 4              dated 6/22/18, Bates stamped
                UNOS_0018602 to 18606            135
 5
        Exhibit 18    email from Alexandra Glazier to
 6              Brian M. Shepard, dated 4/28/17,
                Bates stamped UNOS_0018421 to
 7              18422                            141
 8      Exhibit 19  email chain; top email from Mary
                D. Elison to Alexandra Glazier,
 9              dated 2/26/19, Bates stamped
                UNOS_0158410 to 158411           147
10
        Exhibit 20  email chain; top email from Susie
11              Spinson to Brian M. Shepard,
                dated 3/9/22, Bates stamped
12              UNOS_0829102 to 829116           152
13      Exhibit 21  Article from Crain's New York
                Business entitled "Organ-
14              allocation lawsuits spurring
                changes in NY"                   156
15
        Exhibit 22  Article entitled "New Liver
16              Allocation Policy to Go into
                Effect February 4; Threats
17              Remain"                          159
18      Exhibit 23  email chain; from Mary D. Elison
                to Elizabeth C. Miller and
19              Samantha Noreen, dated 9/19/18,
                Bates stamped UNOS_0051826 to
20              51829                            162
21      Exhibit 24  email chain; top email from
                Charles Alexander to Brian M.
22              Shepard, dated 6/28/18, Bates
                stamped UNOS_0143681 to 143684   173
23
24
```

Veritext Legal Solutions
346-293-7000

```
 1              E X H I B I T S, (Continued)
 2      EX. NO.                                      PAG
 3        Exhibit 25  email chain; top email from
                   Alexander Glazier to Brian M.
 4                 Shepard, dated 11/27/17, Bates
                   stamped UNOS_0144534 to 144536       175
 5
          Exhibit 26  Article entitled "THE LUNG
 6                 LAWSUIT: A CASE STUDY IN ORGAN
                   ALLOCATION POLICY AND
 7                 ADMINISTRATIVE LAW, written by
                   Alexandra Glazier, Bates
 8                 UNOS_0039596 to 39605               177
 9        Exhibit 27    Document from HRSA, Bates stamped
                   HHS_00010421 to 10458              180
10
          Exhibit 28  Article from The Washington Post
11                 entitled "Dispute threatens to
                   disrupt flow of organs to
12                 transplant hospitals"               188
13        Exhibit 29  Document entitled "42 U.S.C.A.,
                   Section 273, organ procurement
14                 organizations, Effective
                   November 21, 2013, Currentness"     192
15
          Exhibit 30  email from Amber L. Amato to
16                 Executive Team, dated 11/21/17,
                   Bates stamped UNOS_0085988 to
17                 85990                               205
18        Exhibit 31  email chain; top email from
                   Alexandra Glazier to Brian M.
19                 Shepard, dated 2/22/17, Bates
                   stamped UNOS_0018491 to 18492       208
20
          Exhibit 32     email chain; top email from Brian
21                 M. Shepard to Alexandra Glazier,
                   dated 6/8/18, Bates stamped
22                 UNOS_0019003 to 19004               216
23        Exhibit 33  Document entitled "EXHIBIT T,"
                   Bates stamped HHS_00007239 to
24                 7242                                217
```

Page 7

```
 1              E X H I B I T S, (Continued)
 2     EX. NO.                                    PAGE
 3       Exhibit 34  email chain; top email from Alexandra
                Glazier to Brian M. Shepard, dated
 4              1/29/18, Bates stamped UNOS_0144327
                to 144335                         222
 5
       Exhibit 35  email chain; top email from Alexandra
 6              Glazier to Matthew A. Prentice and
                Kevin J. O'Connor, dated 5/30/18,
 7              Bates stamped UNOS_0020368 to
                20379                             227
 8
       Exhibit 36  Article from UNOS News, entitled
 9              "Resources related to geographic
                distribution discussion"         228
10
       Exhibit 37  email from Brian M. Shepard to
11              Chelsea Haynes, et al., dated
                6/2/18, Bates stamped
12              UNOS_0039606 to 39607             233
13       Exhibit 38   email chain; top email from
                Alexandra Glazier to James B.
14              Alcorn, dated 6/5/18, Bates
                stamped UNOS_0097685              235
15
       Exhibit 39  email chain; top email from
16              Christopher J. McLaughlin to
                Joel Newman, et al., dated
17              6/6/18, Bates stamped
                UNOS_0094275 to 94276             237
18
       Exhibit 40     Letter to The Honorable Alex M.
19              Azar II from Motty Shulman,
                dated 5/30/18, Bates stamped
20              HHS_00001907 to 1916             242
21       Exhibit 41  email chain; top email from
                Alexandra Glazier to Brian M.
22              Shepard, dated 6/5/18, Bates
                STAMPED UNOS_0017634 TO 17635     244
23
24


                                           Page  8
```

CONFIDENTIAL

```
 1              E X H I B I T S, (Continued)
 2     EX. NO.                                    PAGE
 3       Exhibit 42  email from Jason Lavinder to
                Emily Levine, dated 5/31/18,
 4              Bates stamped HHS_00002070 to 2074    245
 5       Exhibit 43  email chain; top email from Brian
                M. Shepard to Kevin O'Connor,
 6              dated 6/4/18, Bates stamped
                UNOS_0019183 to 19185                 249
 7
         Exhibit 44  email chain; top email from
 8              Alexandra Glazier to Brian M.
                Shepard, dated 6/4/18, Bates
 9              stamped UNOS_0019009 to 19011          251
10       Exhibit 45  email chain; top email from
                Alexandra Glazier to Brian M.
11              Shepard, dated 6/16/18, Bates
                stamped UNOS_0018991 to 18993          254
12
13
14
                         *   *   *
15
16
17
18
19
20
21
22
23
24
```

Page 9

```
 1       A.   Yes.

 2       Q.   And Exhibit 13 is that draft memo to the

 3   HRSA administrator?

 4       A.   I'll take your representation of that.

 5       Q.   Okay, thank you.

 6            My question is whether you played -- what

 7   role you played in drafting Exhibit 13, if any.

 8       A.   I don't recall.

 9       Q.   Let me ask you to go back to -- let me ask

10   you to go back to your declaration.

11       A.   Hold on one second.

12       Q.   Sure.

13       A.   Exhibit 1; is that correct?

14       Q.   Yes, that's correct.  Thank you.

15            I'd ask you to look at Paragraphs 6 and 7.

16   If you could read those and let me know when you've

17   done so.

18       A.   (Witness reviews document) Okay.

19       Q.   In Paragraph 7, you accuse the plaintiffs

20   in this litigation of making false representations

21   about you in order to obtain private email

22   conversations; is that correct?

23       A.   Yes.

24       Q.   Have you ever reviewed the representations
```

Page 123

CONFIDENTIAL

```
 1              MR. FEE:  Objection to the form.
 2       A.   I'd have to go back and look at it.  I
 3    don't know what his arguments were.
 4       Q.   Okay.  Do you recall him arguing that DSAs
 5    were not drawn with allocation in mind?
 6              MR. FEE:  Objection.  Asked and answered.
 7       A.   I don't recall Motty Shulman's arguments.
 8       Q.   Okay.  Have you ever argued that?
 9              MR. FEE:  Objection to the form.  Vague.
10       A.   I'm not sure what you mean by "argued."
11       Q.   Is it your position -- have you -- well,
12    have you ever told OPTN that DSAs were not drawn
13    with allocation in mind?
14       A.   I don't know if I've told OPTN that.  But
15    I've published it in peer-reviewed articles, and
16    I've said it publicly many, many times.
17       Q.   And we'll get to that.
18              Let me ask you to look at Paragraph 10 of
19    your declaration, Exhibit 1.
20       A.   Yes.
21       Q.   You state in the first sentence, "I
22    understand that the sealed version of the brief
23    references a private email from me in April 2017
24    that includes a flippant remark about certain
```

Page 140

```
 1    transplant surgeons who were asserting a particular

 2    argument in a scientific journal."

 3              Did I read that correctly?

 4        A.    Yes.

 5        Q.    And what was the flippant remark; do you

 6    recall?

 7        A.    I do.

 8        Q.    What was it?

 9        A.    The flippant remark was basically related

10    to my comment that I thought those who were arguing

11    to keep organs close, you know, ought not to be

12    doing that when the real issue related to access was

13    better addressed outside of organ allocation.

14              If you're asking me to read from the email,

15    you can give me the email.

16        Q.    No.  I'm asking you if you remember what

17    was flippant about the remark you made.

18        A.    What was flippant about the remark was that

19    it had an expletive in it.

20              MR. CANFIELD:  Well, let me show you the

21    email.

22                    (Document marked as Glazier

23                     Exhibit 18 for identification)

24        Q.    Ms. Glazier, the court reporter has given
```

Page 141

Case 1:19-cv-01783-JAT Document 685-4 SEALED Filed 04/24/23 Page 14 of 49
Case 1:19-cv-01783-JAT Document 685-4 SEALED Filed 04/24/23 Page 14 of 49
CONFIDENTIAL

```
 1      you what's been marked Glazier Deposition Exhibit

 2      18, which bears UNOS Production Nos. 18421 to 18422.

 3      It's an email from you to Brian Shepard on April 28,

 4      2017 at four in the afternoon.

 5              Is this the email that's referred to in the

 6      paragraph of your declaration that we just talked

 7      about?

 8      A.   Yes.

 9      Q.   And the flippant remark -- and I don't mind

10      reading it -- is, you say, "I can say," quote, "'The

11      fact that some states do better than others in

12      preventing preventable deaths and providing health

13      care insurance coverage and access means you're a

14      dumb fuck for living there and should immediately

15      write your legislators that you want better social

16      infrastructures before you try to argue that people

17      who live in the state just voted the best one in the

18      country should die waiting for livers.'"  That's the

19      statement?

20      A.   You read that correctly.

21      Q.   And in your declaration, you say that's a

22      flippant remark about transplant surgeons.

23              Help me understand how that's not a

24      flippant remark about people who live in that part
```

Page 142

```
 1      of the country.
 2            MR. FEE:  Objection.
 3       A.   So this one part of one sentence of one
 4      email out of the hundreds that have been produced in
 5      this discovery has been quoted out of context and
 6      mischaracterized many, many, many times.  And I'm
 7      happy to explain again exactly what I was talking
 8      about here.
 9       Q.   What I'm asking you is to explain how
10      that's a remark about surgeons.
11       A.   I am not talking about patients.  I'm
12      talking about surgeons.  And you can see that
13      because I specifically say, "before you try and
14      argue that people who live in the state," etc.
15            The people who are making arguments were
16      the surgeons who are looking to keep the status quo
17      and keep organs close.
18            And I'm concerned that, you know, the
19      argument that I'm making here is actually the
20      opposite of geographic bias.  This entire email
21      string is about a letter to the editor I published
22      in AJT.  And in it, I argue that a transplant
23      candidate's access to organ offers should be equal,
24      regardless of where they live; that their place of
```

Page 143

CONFIDENTIAL

```
 1    residence should not determine their access to organ

 2    offers.  That's the opposite of geographic bias.

 3         Q.   And you don't regret this remark, as I

 4    understand it, but for the use of the expletive?

 5         A.   Well --

 6         MR. FEE:  Objection to the form.

 7         A.   What I've said is I wish I had chosen words

 8    differently in this private remark.  But I stand by

 9    my comment that I think it's not right to argue that

10    organs should stay local to solve other unrelated

11    issues of access to health care.

12              And in fact, individuals at Plaintiff

13    institutions, including Jayme Locke and others, have

14    very recently made very similar arguments; that one

15    of the largest equity to access issues is, in fact,

16    access to health care, which will not be solved by

17    organ allocation policies.  And that was precisely

18    my point in this letter to the editor.

19         Q.   So you wouldn't regret anything about this

20    email if instead of saying, "You're a dumb fuck for

21    living there," which you said refers to surgeons;

22    not patients, you said, "The fact that some states

23    do better than others in preventing preventable

24    deaths and providing health care insurance...and
```

Page 144

```
 1    access" means you're -- you shouldn't be living
 2    there?  Is that then not objectionable to you?
 3              MR. FEE:  Objection to the form.
 4         A.   This is a flippant remark.  My point, as
 5    I've said before, is that the social infrastructures
 6    and access to health care are very serious issues
 7    that determine equitable access to everything,
 8    including transplantation.  And those issues need to
 9    be addressed.
10              But solving for those issues is unrelated
11    to organ allocation policy, and it is disingenuous
12    to say that keeping organs local will somehow get
13    organs to the very individuals who don't have access
14    to the transplant list.  That's my point.
15         Q.   My question was not to ask you for a
16    speech.
17              MR. FEE:  Objection.
18         Q.   My question was I think a simple one of, If
19    instead of saying "dumb fuck," you had said "means
20    you're ignorant" or "shouldn't be living there," you
21    would have no regret about this email?
22              MR. FEE:  Objection to the form.
23         Q.   Can you answer that "yes" or "no"?  If you
24    can't, then I'll move on to another question.
```

Page 145

CONFIDENTIAL

```
 1        Q.   It seems important, doesn't it?

 2             MR. FEE:  Objection.

 3        A.   I'm saying I don't recall because this was

 4   back in 2017.  I don't recall.

 5       *Q.   You don't recall whether the Executive

 6   Committee was overriding the wishes of the Thoracic

 7   Committee, responsible for lungs, in making this

 8   change in lung policy?

 9             MR. FEE:  Objection to the form.

10        A.   What's your question?

11             MR. CANFIELD:  The court reporter will read

12   it back.

13             *(Question read)

14             MR. FEE:  And there's an objection.

15        A.   I do not believe that they were, but I

16   don't have a specific recollection.

17        Q.   Do you have any specific recollection of

18   considering the Thoracic Committee's views?

19        A.   The Thoracic Committee's views were

20   definitely discussed.

21        Q.   You just can't recall what they were at

22   this point?

23        A.   I do not recall.

24             MR. FEE:  Mr. Canfield, would this be a
```

Page 202

```
 1    good time to take a five-minute break or so for the
 2    bathroom and stretch?
 3              MR. CANFIELD:  Sure.
 4              THE VIDEOGRAPHER:  The time is 3:23.  We're
 5    off the record.
 6              (Recess taken from 3:23 to 3:34)
 7              THE VIDEOGRAPHER:  We're back on the
 8    record.  The time is 3:34.
 9         BY MR. CANFIELD:
10         Q.    Ms. Glazier, do you agree that prioritizing
11    local first means that organs do not travel as far,
12    which reduces damage to the organ and improves
13    outcomes?
14         A.    Can you define "local first"?
15         Q.    The way you used it in the article.
16              MR. FEE:  Objection.
17         A.    Well, what I said in the article was,
18    actually, it depends on how you define "local
19    first."
20         Q.    Well, let me to ask you to look at the
21    article.  I think we looked at this section before.
22              141, Page 141.  "This may seem like it
23    makes some sense - prioritizing 'local' first may
24    mean that the organs do not travel as far, which
```

Page 203

```
 1    reduces damage to the organ and improves outcomes."

 2            The question is, Do you agree with that

 3    statement?

 4        A.   I agree with the statement that it may seem

 5    like it makes some sense.  And then I also agree

 6    with my statement on the next page that the term,

 7    quote, local, as used within the transplant

 8    community to mean, quote, within the DSA is not a

 9    good proxy for geographically close by, quote.

10        Q.   Did I read your article statement correctly

11    when I read, "Prioritizing," quote, "'local first

12    may mean that the organs do not travel as far, which

13    reduces damage to the organ and improves outcomes"?

14            Did I read that correctly?

15            MR. FEE:  Objection.  You didn't, Mr.

16    Canfield.  I just want to say "local" -- there's

17    another quotation at the end of "local."  You only

18    said one quotation mark.  "Local," itself --

19        Q.   With that correction, did I read it

20    correctly?

21        A.   Yes.

22        Q.   And in the next sentence, you say, quote,

23    "It may also mean that OPOs and the transplant

24    centers in the DSA can foster close working
```

Page 204

```
 1    relationships for more efficient organ placement."
 2            Did I read that correctly?
 3    A.    Yes.
 4    Q.    Would you be surprised to learn that the
 5    Thoracic Committee opposed removing DSAs from lung
 6    allocation out of concern for these very factors?
 7            MR. FEE:  Objection to the form.
 8    A.    When?  When was this?
 9    Q.    In connection with the lung change in
10    Thanksgiving week of 2017.
11    A.    And based on -- I'm sorry, what's your
12    question?
13    Q.    The question was, would you be surprised to
14    learn that the Thoracic Committee opposed removing
15    DSAs from lung allocation for these very reasons?
16            MR. FEE:  Objection.
17    A.    I would not be surprised.
18                    (Document marked as Glazier
19                    Exhibit 30 for identification)
20    Q.    Ms. Glazier, the court reporter has handed
21    you what's been marked Glazier Deposition Exhibit
22    No. 30, which bears UNOS Production Nos. 85988
23    through 85990.
24            The first page is an email from Amber Amato
```

Page 205

1    at UNOS to Executive Team UNOS; "Subject:  Lung
2    Update ET minutes."
3           And it states, "You can find notes from
4    today's meeting relating to lung allocation on the
5    Executive Team Sharepoint site attached."  And the
6    two pages that follow are those Executive Team
7    meeting minutes.
8           You were not present at that Executive Team
9    meeting, I don't believe.  You're not listed as
10   having been present.  But if I could ask you to look
11   at the first paragraph.  It says, "Lung update,"
12   which reads, "Thoracic Committee was briefed on the
13   lung allocation lawsuit, and they do not like the
14   proposed reallocation solution to remove DSAs
15   because of transportation costs, insufficient
16   partnerships between transplant centers and OPOs
17   outside the DSAs, and displeasure with the way LAS
18   allocates to the person with the greatest medical
19   need.  These are the same complaints against liver
20   reallocation."
21          Do you see that?  Did I read that
22   correctly?
23       A.   Yeah, I've never seen this before.  I was
24   not at the meeting, as you note.  I've never seen

Page 206

1    the minutes prior to right now.  And you read them

2    correctly.

3        Q.   Is there a reason why your article fails to

4    acknowledge the Thoracic Committee's opposition to

5    the Executive Committee's decision to change lung

6    allocation policy?

7            MR. FEE:  Objection.

8        Q.   Or the reasons stated for that opposition?

9        A.   Well, I have just testified I have not ever

10   seen these meeting minutes.  I was not at the

11   Executive Team meeting, nor was I on the Thoracic

12   Committee.

13           So I would say in general, that I do recall

14   that nobody is pleased when a lawsuit changes

15   precipitously allocation.  And so that's why I'm not

16   surprised.

17       Q.   You didn't think that opposition was

18   important enough to reflect in your article?

19           MR. FEE:  Objection.

20       A.   I didn't say that.

21       Q.   I'm asking you that.

22           MR. FEE:  Objection.

23       A.   No, I didn't say that.  I don't have --

24       Q.   Your article doesn't reference the Thoracic

                                        Page 207

```
 1       Committee opposition --
 2           A.   The article does not reference the
 3       Thoracic --
 4               MR. FEE:  Objection.  That's not a
 5       question.
 6           Q.   I'm asking, is it because you didn't think
 7       it was important to reference?
 8           A.   That's not correct.
 9               MR. FEE:  Objection.
10                   (Document marked as Glazier
11                    Exhibit 31 for identification)
12           Q.   Ms. Glazier, the court reporter has handed
13       you Glazier Deposition Exhibit 31, which bears UNOS
14       Production Nos. 18491 through 18492, which is an
15       email exchange at the top between you and Brian
16       Shepard on February 22nd, 2017.
17           A.   (Witness reviews document)  I'm just
18       reading it.  (Witness reviews document)  Okay.
19           Q.   The concerns reported -- the Thoracic
20       Committee concerns reported in Exhibit 30 that we
21       just discussed about changing -- about removing DSA
22       from lung allocation policy, you've often mocked
23       those kind of concerns as logistical considerations
24       irrelevant to the policy-making process, correct?
```

Page 208

```
 1    one of them.
 2         Q.   And it was hatched by you, right?
 3              MR. FEE:  Objection.
 4         A.   No.
 5              MR. CANFIELD:  Okay.
 6                   (Document marked as Glazier
 7                   Exhibit 32 for identification)
 8         Q.   Ms. Glazier, the court reporter has handed
 9    you what's been marked Glazier Deposition Exhibit
10    32, which bears UNOS Production Nos. 19003 and
11    19004, which is an email string that ends between
12    you and Brian Shepard, dated June 8, 2018.
13              Is that the email, in your understanding,
14    that we've just been talking about?
15         A.   Yes.
16         Q.   And it says, "At least he commends the geo
17    committee.  I believe that idea (to create comm that
18    would develop principles) was hatched by us," and
19    then a smiley emoji.
20         A.   Yeah.
21         Q.   And you were both referring to the email at
22    the outset of the email chain which is from Frank
23    Holloman at HRSA?
24              MR. FEE:  Objection to the form.
```

Page 216

```
 1        A.   I'm sorry, what's your question?

 2        Q.   You're both commenting on a letter that

 3   Frank Holloman has just sent to Yolanda Becker and

 4   Brian Shepard regarding Critical Comments received,

 5   correct?

 6        A.   Correct.

 7        Q.   And that was the letter that asked OPTN to

 8   respond to what we've called the "Motty Shulman

 9   Liver Critical Comment," correct?

10        A.   Correct.

11             MR. CANFIELD:  Let me show you that letter.

12                  (Document marked as Glazier

13                   Exhibit 33 for identification)

14        Q.   The court reporter has handed you what's

15   been marked Glazier Deposition Exhibit No. 33, which

16   is in the record as -- it's in the litigation docket

17   as Document 1-20 and bears Production Nos. HHS_7239

18   through 7242.

19             Do you see that?

20        A.   Yes.

21        Q.   And it's on the second page of that letter,

22   the one that has HHS Production No. 7241, that

23   there's a reference to, "The OPTN has also recently

24   created an ad hoc Geography Committee to review the
```

```
 1      use of geography in allocation policies."
 2              Do you see that?
 3          A.   I do.
 4          Q.   And the letter which is from George
 5      Sigounas, HRSA's administrator, then says, "Which I
 6      commend," correct?
 7          A.   That's what it says.
 8          Q.   And is that what you were referring to in
 9      the email that's Deposition Exhibit 32?
10          A.   Yes.
11          Q.   And then Brian Shepard in response to you
12      says, "Oh, yeah?  Read the next one."  Do you see
13      that?
14          A.   I do.
15          Q.   So if you look at the next paragraph in
16      this letter, do you see what that paragraph -- what
17      does that paragraph discuss?
18              MR. FEE:  Objection to the form.
19          Q.   If you would look at the HRSA letter, which
20      is Exhibit 33, immediately following the paragraph
21      about the Geography Committee, it states, "To assist
22      HHS in its consideration of the critical comment
23      received on May 30, I am seeking the views of the
24      OPTN on the issues raised.  Please provide the
```

Page 218

CONFIDENTIAL

```
 1       OPTN's views on whether the following aspects of the
 2       revised OPTN Allocation Policy are consistent with
 3       the requirements of NOTA and the OPTN final rule,
 4       including 42 CFR 121.8(a)8."
 5              And then it has, "No. 1.  Using DSAs as
 6       units of allocation.  2.  Using OPTN regions as
 7       units of allocation," etc.  Do you see that?
 8          A.   I do.
 9          Q.   So as in lung, HRSA is now asking OPTN to
10       specifically look at the use of DSAs not just in
11       liver, but for all organs, correct?
12              MR. WEBER:  Objection to the form.
13              MR. FEE:  Objection.
14          A.   Yes.
15          Q.   And that seems to be -- is that your
16       understanding of what Brian Shepard was referring to
17       when he said in his email to you, "Oh, yeah?  Read
18       the next one"?
19              MR. FEE:  Objection.
20          A.   I have no idea what he was referring to.
21          Q.   The idea of the Geography Committee, was it
22       not, was to bypass the Liver Committee and override
23       the community's continued belief in the use of DSAs
24       in liver allocation?
```

Veritext Legal Solutions
346-293-7000

1          MR. FEE:  Objection.

2      A.    That's not correct.

3      Q.    Are you aware of charges that membership in

4  the committee was stacked to support of the

5  elimination of DSAs?

6      A.    What's your question?

7      Q.    Are you aware of charges in the community

8  that membership on the ad hoc Geography Committee

9  was stacked to support an outcome that would result

10  in elimination of DSAs?

11      A.    Charges by who?

12      Q.    By people in the OPTN community.

13      A.    Not really.  I guess I'm not clear what you

14  mean by "charges."

15      Q.    Talk, accusations, questions.

16      A.    There's always questions about who's

17  appointed to committees.

18      Q.    No special ones regarding this committee?

19          MR. FEE:  Objection to the form.

20      A.    Not that I recall.

21      Q.    Did you play any role in suggesting

22  committee members?

23      A.    No.

24      Q.    You were on the committee, correct?

CONFIDENTIAL

```
 1          A.    Yes.

 2          Q.    Who was the committee chair?

 3          A.    Kevin O'Connor.

 4          Q.    Did you know Mr. O'Connor prior to your

 5     service with him on the committee?

 6          A.    Yes.

 7          Q.    How did you know him?

 8          A.    He worked at New England Organ Bank with me

 9     previously.

10          Q.    How many years did you work together there?

11          A.    I'm not sure.

12          Q.    Does five or six sound right?

13          MR. FEE:  Objection.

14          A.    It could be.

15          Q.    You played an oversized role in drafting

16     the Geography Committee's findings, did you not?

17          MR. FEE:  Objection.

18          A.    I did not.

19          Q.    I understand he has now passed away, but

20     did you know Chad Southward?

21          A.    I did.

22          Q.    And was he the Geography Committee's

23     original staffer?

24          A.    Yes.
```

Page 221

1          Q.   Do you recall asking him to eliminate

2     "local" from the committee's lexicon?

3          A.   I need a little more context than that.

4          Q.   Do --

5          A.   No.

6          Q.   You recollection is you don't recall or

7     you --

8               MR. FEE:  Objection to the form.  It's

9     mischaracterizing the testimony.

10         A.   Can you restate your question?

11         Q.   My question was, do you recall asking Mr.

12    Southward, when he was the staffer for the Geography

13    Committee, to remove the word "local" from the

14    committee's lexicon?

15         A.   What do you mean "lexicon"?

16                   (Document marked as Glazier

17                   Exhibit 34 for identification)

18         Q.   Ms. Glazier, the court reporter has handed

19    you what's been marked as Glazier Deposition Exhibit

20    No. 34, which bears UNOS Production Nos. 0144327

21    through 0144335, which is an email chain beginning

22    in January 25, 2018 and ending in January 29th,

23    2019, with an email between you and Brian Shepard.

24              Do you recall this email chain?

                                        Page 222

```
 1        A.   Not really.  I'm going to need to review
 2     it.
 3        Q.   Sure.  Take whatever time you need, and let
 4     me know when you're ready.
 5        A.   (Witness reviews document)
 6        Q.   Ready?
 7        A.   Almost.  Sorry, I'm on my last page here.
 8     (Witness reviews document) Okay.
 9        Q.   So Mr. Southward, in the first two emails,
10     had solicited comments on what should be the
11     geographic principles, correct?
12        A.   Yes.
13        Q.   And then had taken a shot, I take it, at
14     articulating those in the first email, correct?
15        A.   Yeah, it looks like he collected what
16     was -- comments he had received and put together.
17        Q.   And you, copying the chairman of the
18     committee, your former colleague at NEDS, you
19     provided comments on what he drafted, correct?
20        A.   Right.  In his email he said, "If you have
21     questions or additions to the statement below, let
22     me know."
23        Q.   Right.
24        A.   And I did.
```

Page 223

CONFIDENTIAL

1      Q.   You did.  And one of those was that -- No.
2    7 was, "I would request we not use the term
3    'local,'" correct?
4      A.   I said, "I respectfully disagree with this.
5    But given that others may think it's important, I
6    would request we not use the term 'local.'"
7          And then I go on to describe that, "For my
8    DSA, 'local' includes 6 states."  And I say, "I can
9    assure you no one living in Connecticut thinks Maine
10   is 'local.'  For Kevin's DSA 'local' includes
11   800,000 square miles.  To use 'local' as it relates
12   to DSA in this context we would really be stating
13   'deceased donor organs considered primarily the
14   resource of the OPOs to be distributed to that OPO's
15   affiliated programs however near or far they are.'"
16     Q.   Do you want to read any more of your
17   comments?
18     A.   If you'd like me to.
19     Q.   No.  I just needed my question answered.
20   But let me ask you a different question.
21          So Mr. Southward took your comments and
22   replied to both you and your former colleague and
23   the chair with thanks, and then your colleague
24   chimed in -- the chair of the committee chimed in

                                        Page 224

```
 1    that he wanted to reiterate some of the points you

 2    had made, correct?  This is in his email of

 3    a.m.

 4              MR. FEE:  Objection.

 5         Q.   On Monday, January 29th, at UNOS0144328.

 6              MR. FEE:  Objection.

 7         Q.   In the first one he said -- and I'll read

 8    what he said.  He said, "Chad," quote, "I want to

 9    reiterate one of the points made below by Alex.  The

10    need to discontinue the use of," quote, "'local,'"

11    closed quote, "in the context of organ

12    distribution."

13              Do you see that?

14         A.   Yes.

15         Q.   And Mr. O'Connor, the chair, included Mr.

16    Shepard on that email, correct?

17         A.   Yes.

18         Q.   He added him to that string?

19         A.   Yes, who commented himself, correct.

20              MR. FEE:  Objection to the form.

21         A.   It looks like Brian Shepard replied to that

22    email, yes.

23         Q.   Yes.

24              And then Mr. Southward said, replying to
```

Veritext Legal Solutions
346-293-7000

Case 1:19-cv-07380-AT Document 65-8 SEALED Filed 11/03/24 Page 45 of 49
Case 1:19-cv-07380-AT Document 85-4 Filed 01/30/25 Page 35 of 49
CONFIDENTIAL

```
 1    all three of you, "Very good points about the quote
 2    local term" -- local in quotes term -- "we'll make
 3    some changes based on the discussion."  And there's
 4    then a further comment from the chair, your former
 5    colleague, Mr. O'Connor, correct?
 6        A.   Correct, suggesting that in DSA and out of
 7    DSA, rather than implying nearby or far away.
 8        Q.   Well, his final statement is, quote, "We
 9    need to move away from using 'local,'" in quotes,
10    "as code for 'mine,'" in quotes, "IMO," which I
11    think means "in my opinion," correct?
12        A.   Yes.
13        Q.   And then you said -- you responded and
14    said, "Yes, excellent.  Obviously I completely
15    agree."
16        A.   Yes.
17        Q.   And then Mr. Shepard responded just to you
18    by saying, "With yourself?"
19             And you responded just to him, "Well,
20    that's why it's obvious.  Smartass," with an emoji,
21    correct?
22        A.   Yes.
23        Q.   Your role on the committee and influence
24    continued with the preparation of the
```

Veritext Legal Solutions
346-293-7000



$\cancel{\mathcal{B}}$. #36

# Resources related to geographic distribution discussion

Jun 13, 2018 | Education, News



At its June 11-12 meeting, the OPTN/UNOS Board of Directors approved a statement of principles to guide future policy relating to organ distribution.

These principles were recommended by the Ad Hoc Geography Committee, which the Board formed in December 2017 to accomplish three things:

- Establish defined guiding principles for the use of geographic constraints in organ allocation
- Review and recommend frameworks/models for incorporating geographic principles into allocation policies

- Identify uniform concepts for organ specific allocation policies in light of the requirements of the OPTN Final Rule

The recommended frameworks will be available for public comment in August.

The following resources will help inform you about the geographic distribution discussion and actions. We will continue to provide resources and update the transplant community with the latest information on a regular basis.

*Current resources include:*

- The Ad Hoc Geography Committee page listing its charge, membership and summary reports
- An archived version of the June 6 member memo from Yolanda Becker, M.D., President of the OPTN/UNOS Board of Directors
- A presentation delivered to the committee addressing legal and regulatory history and perspectives for organ distribution in the United States
- A journal article analyzing legal issues related to the emergent lung allocation policy enacted in November 2017

Look for additional updates on this initiative through additional periodic e-mails and the Transplant Pro e-newsletter.

ACTION AGENDA

## Actions to strengthen the U.S. organ donation and transplant system

Driving improvements together



## UNOS appoints new CEO

Maureen McBride, Ph.D., will lead the organ donation and transplant community through time of change and opportunity ›



Understand. Compare. Improve.

Access research and data analytics to improve performance and increase transplant

- › **For transplant hospitals ›**
- › For OPOs ›

## Quick links

- COVID-19 news and resources
- OPTN policy notices | Policies
- OPTN evaluation plan
- OPTN data reports
- Regional meetings
- TransNet℠ resources
- UNet℠ University
- UNet℠ system notices

Access UNet℠

UNOS

# Consistent with the Final Rule
# and Legally Defensible

Alexandra K Glazier, Esq.
President & CEO, New England Donor Services

Executive Committee, OPTN Board of Directors

**Consistent with the Final Rule**

## Two Legal Considerations

- Consistent with the final rule?
  - Distribution of organs over as broad a geographic area as feasible

- Will it pass judicial review in court?
  Rationally determined

Consistent with the Final Rule

UNC 15

# Final Rule: Geography as a Component of Allocation Policy

*Policy development* **The Board of Directors** established under § 121.3 shall develop, in accordance with the policy development process described in § 121.4, policies for the equitable allocation of cadaveric organs among potential recipients. Such allocation policies

(1) Shall be based on sound medical judgment;

(2) Shall seek to achieve the best use of donated organs;

(3) Shall preserve the ability of a transplant program to decline an offer of an organ or not to use the organ for the potential recipient in accordance with § 121.7(b)(4)(d) and (e);

(4) Shall be specific for each organ type or combination of organ types to be transplanted into a transplant candidate;

(5) Shall be designed to avoid wasting organs, to avoid futile transplants, to promote patient access to transplantation, and to promote the efficient management of organ placement.

(8) Shall not be based on the candidate's place of residence or place of listing, except to the extent required by paragraphs (a)(1)-(5) of this section.

**Consistent with the Final Rule**

LNOS

# The OPTN's Legal Responsibility Under NOTA and the Final Rule

- NOTA created the OPTN (42 U.S.C. § 274)

- Pursuant to NOTA, HHS promulgates regulations that govern the OPTN (42 C.F.R § 121)

- The OPTN's Board of Directors are responsible for developing policies for the operation of the OPTN

- OPTN policies are under the regulatory authority of HHS

- Legal status of agency rules

**Consistent with the Final Rule**

# Judicial Review of Agency Actions

- Administrative Procedures Act (APA)

- Standard of review: arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law

- "Rational basis" test
  Supporting data or principles (show your work)
  Resulting outcome (actual impact)

**Consistent with the Final Rule**

UNOS

# Judicial Review of OPTN Allocation Policies

- Plaintiff's argument: use of the DSA as the primary unit of lung distribution was *arbitrary and capricious*

  *Because DSAs have no correlation to organ viability*

  Because DSAs were not created for organ distribution

  Because DSAs are not consistent in size (geographically, population, patients waiting, donors, # of programs)

  Because using DSAs results in wide variation

  Because using DSAs results in allocation inconsistent with the mandates of the final rule

**Consistent with the Final Rule**

UNOS

## Judicial Review of OPTN Allocation Policies

- Court's analysis (would have been): Does the OPTN have a *rational basis* for this policy?

    Was the OPTN's selection of the DSA supported by a rationale consistent with the final rule?
    - Analysis supporting use of DSA as required to avoid wastage?

    Is the result of using DSAs consistent with the final rule?
    - Distribution not based on candidates place of listing except as required to avoid wastage?

**Consistent with the Final Rule**

# Hitting the Legal Mark Going Forward

- Articulated rationale supporting the use of geographic constraints that are consistent with the final rule
  - Rationally determined
  - Consistently applied

- Principles of geographic constraint used in allocation policies
  Proxy for final rule requirements

  A framework for geographic constraint that is consistent with these principles will be consistent with the final rule

  Legally defensible under APA if a reasonable basis for construction

Consistent with the Final Rule

UNOS

# Principles of Geographic Constraint

Deceased donor organs are a national resource to be distributed as broadly as feasible. Any geographic constraints pertaining to the principles of organ distribution must be rationally determined and consistently applied.

Geographic distribution may be constrained in order to:

- Reduce inherent difference the ration of donor supply and demand across the country

- Reduce travel time expected to have a clinically significant effect on ischemic time and organ quality

- Increase organ utilization and prevent organ wastage

- Increase efficiencies of donation and transplant system resources

**Consistent with the Final Rule**

← ○ ○ ̇  ̇  UNC-S

# Hitting the Legal Mark Going Forward

- Evaluating frameworks:
  Consistent with the principles of geographic constraint?

  Rationally determined?

  Can be consistently applied?

- A word about line drawing: not viewed as arbitrary if there is a reason/support for why the line is drawn

**Consistent with the Final Rule**

UNOS

# Board and Committee Joint Responsibility

- The Board of the OPTN has legal responsibility to ensure policies comply with the Final Rule

- The Committees of the OPTN tasked with policy development must provide the rational basis for geographic constraints within an allocation policy

SHOW OUR WORK

**Consistent with the Final Rule**